# GHASSAN SALEH *v.* RIBEIRO TRUCKING, LLC, ET AL.
## (SC 18515)

Rogers, C. J., and Norcott, Palmer, Zarella, McLachlan, Eveleigh and Harper, Js.

Argued September 7—officially released December 27, 2011

*Michael Feldman*, with whom was *Kasey Procko Burchman*, for the appellant (named defendant).

*Stephanie S. Baier*, with whom, on the brief, was *Richard C. Mahoney*, for the appellee (plaintiff).

*Opinion*

McLACHLAN, J. In this certified appeal, we must examine the delicate balance between two of the most basic principles of our law: the constitutional right of litigants to have the jury determine the amount of damages awarded; and the trial court's broad authority to supervise the trial process. The defendant Ribeiro Trucking, LLC,[1] appeals from the judgment of the Appellate Court,[2] which reversed the judgment of the trial court granting the defendant's motion for remittitur

---

[1] Also named as defendants were Cabbage Transport, Inc., Vincente Virola-Rodriguez and Oscar Quezada. For ease of discussion, we refer to Ribeiro Trucking, LLC, as the defendant in this opinion.

[2] We granted the defendant's petition for certification, limited to the following issue: "Did the Appellate Court properly conclude that the trial court abused its discretion in granting the remittitur and setting aside the verdict?" *Saleh* v. *Ribeiro Trucking, LLC*, 294 Conn. 922, 984 A.2d 1083 (2009).

pursuant to General Statutes § 52-216a.[3] *Saleh* v. *Ribeiro Trucking, LLC*, 117 Conn. App. 821, 829, 982 A.2d 178 (2009). The defendant argues that the Appellate Court improperly concluded that the trial court abused its discretion in ordering the remittitur. We affirm the judgment of the Appellate Court.

Because we discuss the evidence in considerable detail later in this opinion, our initial summary of the factual background is brief. On the morning of March 28, 2003, the plaintiff, Ghassan Saleh, was driving on Interstate 91 in Hartford, when his Nissan Altima was rear-ended by a van that had been rear-ended by a tractor trailer truck owned by the defendant. The plaintiff, who complained of neck, back and shoulder pain at the scene of the accident, was brought to Hartford Hospital by ambulance. He subsequently has been treated by numerous physicians, each of whom has assigned a permanency rating, assessing various percentages of permanent impairment to each injured body part. At the time of trial five years later, the plaintiff testified that he still experienced pain in connection with his injuries from the accident. The parties "stipulated [at trial] that the plaintiff's life expectancy is 15.8 years. The defendant admitted liability for the accident. The jury returned with a verdict of $12,132.31 in economic damages and $687,868 in noneconomic damages for a total of $700,000.31 in damages." Id., 824.

The defendant subsequently filed posttrial motions seeking a new trial, an order setting aside the verdict and an order of remittitur as to the noneconomic damages. Following a hearing on the defendant's motions, the court issued a memorandum of decision, finding

---

[3] General Statutes § 52-216a provides in relevant part: "If the court at the conclusion of the trial concludes that the verdict is excessive as a matter of law, it shall order a remittitur and, upon failure of the party so ordered to remit the amount ordered by the court, it shall set aside the verdict and order a new trial. . . ."

that the noneconomic damages awarded were excessive and ordering a remittitur of $508,608.[4] The court found that the jury reasonably could have awarded the plaintiff $74,260 for permanent injury, and $110,000 for pain and suffering from the date of the accident on March 28, 2003 until October 2, 2006, when the plaintiff was given his permanency rating. The total award, after remittitur, was $191,392.31. Pursuant to § 52-216a, the court further ordered that if the plaintiff failed to remit the amount ordered by the court, the court would set aside the verdict and order a new trial.[5] After the plaintiff refused to accept the remittitur, the court set aside the verdict and ordered a new trial.

The plaintiff appealed from the judgment of the trial court to the Appellate Court, claiming that the trial court "improperly ordered the remittitur in the absence of any reason to determine that the verdict was against the weight of the evidence, shocked the sense of justice or was based on partiality, prejudice, mistake or corruption."[6] Id., 822. The Appellate Court reversed the judgment of the trial court, concluding that the trial court abused its discretion in granting the remittitur. That court concluded that the trial court improperly

[4] The court denied the defendant's motions for a new trial and to set aside the verdict.

The remittitur of $508,608 included a $5000 reduction of the economic damages in accordance with the stipulation of the parties that the medical bills totaling $12,132.31 should be reduced to $7132.31 because of a collateral source in the amount of $5000.

[5] In response to the defendant's motion for rectification or articulation, the court added the following language to its memorandum of decision: "Should the plaintiff agree to the remittitur ordered by this court, a judgment will enter in the amount of $191,392.31. If the remittitur is not accepted by the plaintiff, the [defendant's] motion to set aside the verdict will be granted, the jury award will be set aside and a new trial will be ordered."

[6] We observe that the trial court used the phrase "shocks the conscience," rather than the phrase we most commonly have used in our decisions, "shocks the sense of justice." See, e.g., Mahon v. B.V. Unitron Mfg., Inc., 284 Conn. 645, 661, 935 A.2d 1004 (2007). We view the phrases as having the same meaning and use them interchangeably.

"attempted to attach a mathematical formula to what should have been awarded" and "refus[ed] to allow the plaintiff any compensation for his pain and suffering that occurred after he was given a permanency rating and for his future life expectancy." Id., 828. This appeal followed.

The defendant claims that the Appellate Court did not accord proper deference to the trial court's determination that exceptional circumstances justified the remittitur. Specifically, the defendant contends that the Appellate Court, by failing to employ every reasonable presumption in favor of affirming the decision of the trial court, did not properly apply the abuse of discretion standard. The plaintiff responds that the Appellate Court properly "examin[ed] the evidential basis of the verdict itself" to determine whether the trial court reviewed the evidence in the light most favorable to sustaining the jury verdict. (Internal quotation marks omitted.) Id. We agree with the plaintiff.

Our review of the trial court's grant of remittitur is dictated by, on the one hand, the high bar that must be met before a trial judge may set aside a jury verdict, and, on the other hand, the necessarily broad authority that the trial judge has to oversee the trial process. "The right of trial by jury is of ancient origin, characterized by Blackstone as the glory of the English law and the most transcendent privilege which any subject can enjoy . . . ." (Internal quotation marks omitted.) *Dimick* v. *Schiedt*, 293 U.S. 474, 485, 55 S. Ct. 296, 79 L. Ed. 603 (1935). We repeatedly have stated that the award of damages, in particular, "is a matter peculiarly within the province of the trier of facts." (Internal quotation marks omitted.) *Mahon* v. *B.V. Unitron Mfg., Inc.*, 284 Conn. 645, 661, 935 A.2d 1004 (2007). For that reason, we consistently have held that a court should exercise its authority to order a remittitur rarely—only in the most exceptional of circumstances. See, e.g., *Waters* v.

*Bristol*, 26 Conn. 398, 405 (1857) (declining to set aside verdict on basis of excessive damages, despite this court's view that "[t]he damages assessed are considerable, we are rather inclined to think too large"); *Clark* v. *Pendleton*, 20 Conn. 495, 509 (1850) (observing that, although damages were higher than this court would have awarded, verdict should not be disturbed and court's authority to order remittitur should be exercised rarely).

In determining whether to order remittitur, the trial court is required to review the evidence in the light most favorable to sustaining the verdict. *Wochek* v. *Foley*, 193 Conn. 582, 587, 477 A.2d 1015 (1984). Upon completing that review, "the court should not interfere with the jury's determination except when the verdict is plainly excessive or exorbitant. . . . The ultimate test which must be applied to the verdict by the trial court is whether the jury's award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury [was] influenced by partiality, prejudice, mistake or corruption. . . . The court's broad power to order a remittitur should be exercised only when it is manifest that the jury [has] included items of damage which are contrary to law, not supported by proof, or contrary to the court's explicit and unchallenged instructions." (Internal quotation marks omitted.) *Mahon* v. *B.V. Unitron Mfg., Inc.*, supra, 284 Conn. 661–62.

"Furthermore, [t]he decision whether to reduce a jury verdict because it is excessive as a matter of law [within the meaning of § 52-216a] rests solely within the discretion of the trial court . . . ." (Internal quotation marks omitted.) Id., 662. We have explained the reason underlying the great breadth of the trial court's discretion over such matters: "There are, to be sure, sometimes, verdicts of this kind, when the trial judge is required

by the interests of justice to set them aside. That such verdicts are infrequent is a tribute to the general intelligence, fairness and integrity of juries. This power of supervision and correction which the judge has over the verdict is an essential part of the jury system. It tends to make jurors more careful in reaching their conclusions, and gives confidence to all suitors that the finding of a jury will not be affected by any improper motives. Trial by jury, in the primary and usual sense of the term at the common law and in the American constitutions, is not merely a trial by a jury of twelve [persons] before an officer vested with authority to cause them to be summoned and empanelled, to administer oaths to them and to the constable in charge, and to enter judgment and issue execution on their verdict; but it is a trial by a jury of twelve [persons], in the presence and under the superintendence of a judge empowered to instruct them on the law and to advise them on the facts, and (except on acquittal of a criminal charge) to set aside their verdict, if in his opinion it is against the law or the evidence." (Internal quotation marks omitted.) *Howe* v. *Raymond*, 74 Conn. 68, 71–72, 49 A. 854 (1901). Although *Howe* involved a trial court's decision to set aside a verdict as against the evidence, the same general principles apply to a trial court's decision to order a remittitur. "[Consequently], the proper standard of review of a trial court's decision to grant or deny a motion to set aside a verdict as excessive as a matter of law is that of an abuse of discretion." (Internal quotation marks omitted.) *Mahon* v. *B.V. Unitron Mfg., Inc.*, supra, 284 Conn. 662. Accordingly, "the ruling of the trial court on the motion to set aside the verdict as excessive is entitled to great weight and every reasonable presumption should be given in favor of its correctness." (Internal quotation marks omitted.) Id.

We acknowledge that the "shocks the sense of justice" standard provides vague guidance at best—due,

in part, to the uncertain limits of noneconomic damages. The language is intended to convey the extraordinary departure from reasonableness that is required before a court properly may exercise its authority to set aside the jury's award of damages. We have in the past stated what will *not* be sufficient to support a trial court's decision to set aside the jury's damages award and order a remittitur: "The fact that the jury returns a verdict in excess of what the trial judge would have awarded does not alone establish that the verdict was excessive." *Campbell* v. *Gould,* 194 Conn. 35, 41, 478 A.2d 596 (1984). Regarding what *will* be sufficient to support an order of remittitur, we have stated that a trial court should exercise its discretion to order remittitur only in cases "where very clear, definite and satisfactory reasons can be given for such interference." *Clark* v. *Pendleton,* supra, 20 Conn. 509. For a trial court's remittitur order to be justified, and upheld by this court, we have stated that "we must have laid before us a very clear and striking case of indubitable wrong, so clear and striking as to indicate the influence of undue sympathy, prejudice or corruption on the verdict." *Waters* v. *Bristol,* supra, 26 Conn. 405. Although the trial court's memorandum of decision in the present case did not set forth the specific reasons that led it to conclude that the jury verdict shocked its conscience, we acknowledge that, despite our case law recognizing that such clear, definite and satisfactory reasons must exist to justify remittitur, we have never required that a trial court expressly set forth those reasons in the memorandum of decision. Today we exercise our supervisory authority to require expressly what already has been implicit in our law. In all future cases, a trial court ordering a remittitur must set forth in the memorandum of decision clear, definite and satisfactory reasons for so ordering. Merely stating that an award shocks the conscience or the sense of justice of the court or that

the award does not fall within the necessarily uncertain limits of fair and reasonable compensation will not be sufficient. The recitation of these generalities does little to aid appellate review of the trial court's decision, a review that is complicated by the requirement that appellate tribunals must give deference to that decision, which itself was required to give deference to the jury's verdict. In order for us to determine whether the trial court properly reviewed the evidence in the light most favorable to sustaining the verdict, and did not merely substitute its own judgment for that of the jury, a trial court ordering a remittitur must set forth the evidence, viewed in that light, and explain the specific reasons that led the court to conclude that the award shocked the conscience of the court. We set forth this requirement, not to discourage the trial court from granting remittitur in those cases where it is warranted, but rather to aid the reviewing court in its determination of whether the trial court properly exercised its discretion.

In its memorandum of decision, the trial court found that the jury's award of damages did not "fall within the necessarily uncertain limits of fair and reasonable compensation" and was excessive. The court further stated that the verdict so shocked the conscience that it compelled the conclusion that the award was due to partiality, prejudice or mistake. In summarizing the facts that the jury reasonably could have found, the court identified two time periods. The first time period began on the date of the accident and ended on the date that the plaintiff was given a permanency rating. The second time period began on the date that the plaintiff was given a permanency rating and continued for the remainder of the plaintiff's life, in light of the parties' stipulation that the plaintiff had a life expectancy of 15.8 years. With respect to the first time period, which began on March 28, 2003, and ended on October 2, 2006, a period of approximately forty-two months,

the trial court concluded that the jury reasonably could have awarded the plaintiff damages for pain and suffering totaling $110,000. This amount was based on the court's determination that the jury reasonably could have awarded the plaintiff $5000 per month for the first two months, and $2500 per month for the remaining forty months. With respect to the second time period, from October 2, 2006, onward, the court found that the jury reasonably could have awarded the plaintiff $74,260. The court stated that this amount was based on the plaintiff's life expectancy and the percentages of permanent partial disability assigned to the injured body parts. Although the court did not indicate whether damages for pain and suffering were included in the sum of $74,260, the court noted that the plaintiff continued to experience pain during the second time period as a result of his permanent disabilities.

As we have stated in this opinion, our review of the trial court's decision requires careful balancing. We have the thorny task of deferentially reviewing a decision that itself was required to employ deferential review, where the primary challenge is that the trial court abused its discretion by failing to accord proper deference to the jury's verdict. In a sense, we must retrace the steps of the trial court. That is, we must begin by reviewing the evidence, construed in the light most favorable to sustaining the verdict, just as the trial court was required to do. We then must examine the trial court's decision in such a way that we employ every reasonable presumption in favor of its correctness.

Describing the accident, the plaintiff stated that the impact was "very, very hard." When his car, the rear of which had sustained heavy damage, stopped moving, he realized immediately that his shoulder had been injured and that he could not move his right arm, or even turn around to see what was behind him. He was

placed on a stretcher and taken to Hartford Hospital in an ambulance. Emergency room staff took X rays of the plaintiff's shoulder, back and neck, which revealed that the plaintiff did not have any broken bones. They gave the plaintiff anti-inflammatory and pain medications, advised him to follow up with his physician and released him later that day. The next day, the plaintiff called the office of his general practitioner, William Spector, and took the first available appointment, for April 7, 2003, ten days following the accident. Spector prescribed anti-inflammatory and pain medications and referred him to an orthopedist, Paul Filippini. The medications provided the plaintiff only short-term relief from his pain.

The plaintiff subsequently was treated by a number of different physicians. Following Spector's referral, the plaintiff first saw Filippini on April 29, 2003. At Filippini's recommendation, the plaintiff began receiving physical therapy for his neck and back.[7] He participated in physical therapy for almost seven weeks, but ultimately discontinued the sessions because the treatments offered him no relief, and, in fact, worsened his pain. He last saw Filippini for treatment in March, 2004. For the next ten months, although the plaintiff did not seek any further treatment for his injuries, he continued to receive pain medications prescribed by Filippini.

In January, 2005, the plaintiff began seeing another orthopedist, Anthony Spinella. In June, 2006, Spinella gave him a cortisone shot in his shoulder. The plaintiff experienced some relief—about 20 to 30 percent—from his shoulder pain for a period of about six months following the shot. When questioned as to why he did

---

[7] The plaintiff testified that the physical therapists were unable to perform therapy on his shoulder because the plaintiff's shoulder pain was too great to allow them to touch it.

not receive a second shot for his shoulder, the plaintiff first stated that he wanted to "stretch . . . out" his shots and later testified that he was afraid of needles. When Spinella examined the plaintiff on October 2, 2006, the plaintiff had 50 percent normal cervical motion with pain and 75 percent abduction of the right shoulder with mild discomfort. Straight left leg raises to thirty degrees resulted in low back pain. Based on his examination of the plaintiff during that visit, Spinella rated the plaintiff's permanent injuries as follows: 10 percent injury to the shoulder; 15 percent injury to the neck, 10 percent of which was preexisting; and 15 percent injury to the back, 10 percent of which was preexisting. Filippini assigned a permanency rating of 7.5 to 10 percent with respect to the plaintiff's shoulder injury and 7.5 percent with respect to the plaintiff's back injury.

Spinella referred the plaintiff to a physician at the pain management center at Saint Francis Hospital and Medical Center, Qassem Kishawi, who examined the plaintiff on October 30, 2006. Kishawi recommended that the plaintiff receive cortisone shots in his neck and back, but the plaintiff refused because of his fear of needles. Kishawi twice mentioned in his consultation notes that the plaintiff expressed anxiety at the prospect of receiving shots. Kishawi observed that the plaintiff experienced "severe tenderness" over the lumbar facet joints and tenderness over the sacroiliac joints. On Kishawi's advice, the plaintiff received a magnetic resonance image (MRI) of his lumbar spine, which revealed degeneration, some of it extensive, at various points in the plaintiff's spine. The MRI also revealed disc bulging, herniation and spinal stenosis.

Kishawi then referred the plaintiff to a neurosurgeon, Stephan Lange, who examined the plaintiff on January

11, 2007, and found that he had no tenderness in his cervical, thoracic and lumbar spines. Lange observed that the plaintiff had a normal gait and full range of motion in the cervical neck. The plaintiff had slight tenderness with deep palpation of muscles in the neck, specifically the right sternocleidomastoid. Lange informed the plaintiff that he needed to see the plaintiff's MRI to make a final recommendation, but, based on the MRI report and his physical examination, he recommended that the plaintiff continue with conservative treatment and not pursue surgery.

With respect to the limitations that the plaintiff's injuries placed on him, evidence at trial revealed that he returned to work two days following the accident and was able to perform his usual duties, but only with great discomfort and with the aid of his pain medications. That is, in order to function, the plaintiff had to take pain medication when he woke up in the morning, followed by an additional dose with lunch, another dose in the afternoon, and a final dose at night. Outside of work, the plaintiff found himself unable to engage in certain activities that he previously had enjoyed. For example, prior to the accident, the plaintiff had worked in his yard every day, but after the accident he had to hire people to do the work. He had tried to rake leaves, but found himself "on [his] knees from the pain" in his back. He also used to be able to clean the pool and play with his children, but has been unable to engage in either of these activities since the accident. Finally, the plaintiff testified that he was no longer able to exercise.

The plaintiff testified extensively regarding the level of pain that he had experienced subsequent to the accident. Although he had some preexisting injuries, he testified that prior to the accident, he was experiencing little to no pain—and only infrequently—from those

injuries. At the time of trial—five years after the accident—he testified that without pain medication he was unable to sleep, and even with medication he woke up frequently. He testified that he was seeing his physician every two weeks in order to manage his pain medication and that he took medication on a daily basis, multiple times a day. When asked to describe how his injuries affected him on an average day, the plaintiff stated that because of the pain, each day was a "miserable day." He had headaches every day, and, on a scale of one to ten, the plaintiff rated his average daily pain at an eight. The plaintiff emphasized that the pain was with him every moment of every day, explaining that "it's giving me discomfort when I'm walking, when I'm sleeping, when I'm working, twenty-four hours a day."[8]

In reviewing the trial court's determination to order a remittitur on the basis of these facts, we must be mindful that "[i]n such a matter, a large discretion is of necessity vested in the trial court, and only in cases where that discretion is unreasonably exercised" should this court reverse the judgment of the trial court. *Gray* v. *Fanning*, 73 Conn. 115, 117, 46 A. 831 (1900). The question, then, is not whether we would have ordered a remittitur on this evidence. Rather, our

---

[8] We observe that the plaintiff's submission of medical expenses shows that Filippini's last charge to the plaintiff for pain medications was on August 20, 2004. The plaintiff was not charged for medications again until Spector charged him on December 2, 2004. Additionally, the plaintiff does not appear to have been charged for any pain medications between June, 2005, and November, 2005. Between November, 2006, and June, 2007, the only prescription for which the plaintiff was charged was ninety tablets of ibuprofen.

Although these gaps might indicate either that the plaintiff did not have, and therefore did not take, any medication during those time periods, or that the prescriptions covered those time periods, the plaintiff was not questioned regarding their significance. The issue was not argued to the jury and in any event, in construing the evidence in the light most favorable to sustaining the verdict, any credibility determination must be resolved in favor of the jury's verdict.

inquiry is whether the trial court reasonably could have concluded that, even viewing the evidence in the light most favorable to sustaining the verdict, the evidence fell so far short of supporting the jury's award of damages that the award shocked the conscience of the court.

We emphasize that, in reviewing the evidence in the light most favorable to sustaining the verdict, the trial court, and the reviewing court, are bound by the jury's credibility determinations and all *reasonable* inferences the jury could have drawn from the evidence. The evidence in the present case, when viewed in that light, reveals that the plaintiff has suffered permanent disabilities as a result of the accident. Due to his injuries, he suffers considerable pain every day, at a level of eight out of ten. Testimony at trial revealed that he had suffered that level of pain continuously for five years. There was no evidence presented that the plaintiff's pain had lessened significantly since the accident, and every form of treatment that he had tried had failed to yield an improvement. The parties stipulated that the plaintiff had a life expectancy of 15.8 years—meaning that the plaintiff could expect to suffer significant pain every day for almost sixteen more years following trial. The plaintiff is required to take substantial amounts of medication just to make it through each day, and even with medication, he is now unable to engage in activities that he once enjoyed: playing with his children; exercising; and working around the house. Even employing every reasonable presumption in favor of the correctness of the decision of the trial court, we cannot agree with the court's conclusion that the jury's award fell outside the necessarily uncertain limits of what is fair and reasonable compensation. The trial court's broad discretion over the decision to award remittitur does not extend to a reduction of an award that is within the

range of reasonable compensation, however generous that award may be. Accordingly, because the evidence supports the jury's award of damages, the trial court abused its discretion in ordering remittitur.[9]

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

[9] Because we conclude that the evidence supports the jury's verdict, and, therefore, that the trial court abused its discretion in ordering remittitur, it is unnecessary for us to reach the plaintiff's additional claim that the trial court improperly failed to award any damages for future pain and suffering. We observe, however, that it is unclear whether the court considered the award of $74,260 to include damages for pain and suffering. Although the court did not expressly state that the award did include those damages, the memorandum of decision specifically acknowledges that the plaintiff continued to experience pain and suffering.

Although it is also unnecessary for us to address the plaintiff's claim that the trial court improperly applied a mathematical formula in calculating reasonable damages, we note our disagreement with the Appellate Court's conclusion that the trial court improperly estimated reasonable monthly damages, then multiplied that amount by the number of months during which the plaintiff was entitled to recover. See *Saleh* v. *Ribeiro Trucking, LLC,* supra, 117 Conn. App. 828. There is nothing inherently wrong with estimating damages by that method, so long as that estimation does not run afoul of the requirement that the jury's award must be sustained if it is supported by the evidence viewed in its most favorable light. Our references to the impropriety of using a mathematical formula to calculate reasonable damages have focused on the inappropriateness of requiring a specific proportion between the economic and noneconomic damages. See, e.g., *Campbell* v. *Gould,* supra, 194 Conn. 40 (concluding that trial court improperly ordered remittitur on basis of " 'very low' " special damages, and stating that "[w]e have in the past . . . discountenanced using the special damages as a yardstick by which to measure the general damages"); *Wochek* v. *Foley,* supra, 193 Conn. 585 (trial court improperly ordered remittitur on basis that "only [$300] in special damages was shown").

The distinction between the mathematical formula in the present case and the type of calculation that we have stated is improper is this: The trial court in the present case did not use a mathematical formula to calculate the reasonableness of the damages. It arrived at a determination of what would constitute reasonable damages—without explaining its methodology in arriving at that amount—for a period of one month, and then simply allowed recovery of that amount for the duration of the recovery period. In both *Campbell* and *Wochek,* by contrast, the trial court required a certain proportionality between the economic and noneconomic damages, and determined that the jury award was excessive because the proportion between the two was too high.