ROSARIO LAPPOSTATO *v.* GLENN TERK
(AC 34733)

DiPentima, C. J., and Keller and Bishop, Js.

Argued March 20—officially released June 18, 2013

*Salvatore Bonanno*, with whom was *Glenn T. Terk*, for the appellant (defendant).

*Brennen C. Maki*, for the appellee (plaintiff).

KELLER, J. In this negligent misrepresentation action, the defendant, Glenn Terk, appeals from the judgment of the trial court awarding damages to the plaintiff, Rosario Lappostato, and denying the defendant's postverdict motions. The defendant claims that the court improperly (1) denied his motion for a mistrial, (2) admitted into evidence certain exhibits over his objections, (3) denied his motion for remittitur, (4) denied his motions to set aside the verdict and for judgment notwithstanding the verdict, and (5) failed to conclude that the plaintiff's claims were barred by the applicable statute of limitations. We affirm the judgment of the trial court.

The following facts and procedural history are relevant to our resolution of this appeal. On April 9, 2010, the plaintiff initiated the action underlying this appeal by filing a complaint in which he alleged negligent misrepresentation by the defendant.[1] The matter was tried to a jury on May 24, 25, 30 and 31, 2012. On the basis of the evidence and testimony presented at trial, the jury reasonably could have found the following facts. The defendant is an attorney in Wethersfield who has been in practice for more than thirty years. In 2007 and 2008, he represented Anthony Quintiliani in matters that involved Quintiliani's attempts to obtain millions of dollars purportedly owed to him through international transactions. Before November, 2007, the plaintiff had loaned some money to Quintiliani, expecting to receive a return.

In November, 2007, after the plaintiff expressed reluctance to give Quintiliani more money, Quintiliani had the defendant call the plaintiff. The defendant reassured

---

[1] The plaintiff also raised a legal malpractice claim in his complaint, but that count was dismissed by the court, *Domnarski, J.*, on January 18, 2012, and is not a subject of this appeal.

the plaintiff about the legitimacy of the transaction in which Quintiliani was involved but refused to give the plaintiff details about the transaction, claiming they were confidential. The plaintiff relied on these representations and began investing more of his money with Quintiliani. Following his conversation with the defendant, the plaintiff gave Quintiliani between $15,000 to $25,000 and continued to invest substantial sums of money with him over the course of the next year.

Starting in March, 2008, the defendant authored a series of letters relating to his representation of Quintiliani in connection with his efforts to obtain money through international transactions. The defendant gave the first letter, dated March 12, 2008, to the plaintiff in person. The letter indicated that the defendant represented Quintiliani in connection with his receipt of a sum of money in excess of $5 million and stated that the defendant was in possession of certificates for the release of those funds, that the funds would be released upon the plaintiff's payment of a nonresident tax in the amount of $22,500 and that the funds would be wired to the defendant's trustee account. The defendant did not investigate whether the certificates referenced in the letter were legitimate. Although the plaintiff did not wire $22,500 to the defendant's trustee account, he ultimately did wire that amount to another account on April 16, 2008, in order to have the funds released. The plaintiff also wired $20,815 from his bank account on March 20, 2008, as payment for a nonresident tax so that a large sum of money could be released. In a letter to the plaintiff dated May 2, 2008, the defendant stated that he received confirmation that the funds would be wired to his trustee account within three to four days and that the plaintiff would receive a check from his office upon receipt of the funds.

In a May 15, 2008 letter to the plaintiff, the defendant described another transaction in which more than $9

million was to be wired to the defendant's trustee account from an account in Quintiliani's name at the Canadian Imperial Bank of Commerce. The defendant stated that the plaintiff would receive a check from his office upon the receipt of those funds. The defendant wrote to the plaintiff again on July 9, July 24 and August 4, 2008, in order to keep him updated regarding the status of the Canadian funds.

In a September 25, 2008 letter to the plaintiff, the defendant stated that Quintiliani informed him that a sum of money had arrived and that the plaintiff would be "repaid for [his] loans" the following day. Following his receipt of this letter and a conversation with the defendant in which he was told that $2200 was necessary to secure the release of $2 million, the plaintiff left $2200 in cash for Quintiliani at the defendant's office.

The defendant also had in his file a fax addressed to a third party that referred to his representation of Quintiliani in connection with a transaction in which Quintiliani agreed to pay the third party $2 million in exchange for the third party's payment of $225,000 that would be used to secure the release of $30 million from a private investor in Asia. Attached to the fax were several certificates that supposedly were required for the release of the funds. The certificates contained numerous spelling and typographical errors. The defendant did not determine whether the certificates were legitimate.

Approximately one year prior to the plaintiff's investment of any money, the defendant had conversations with Guilio Cessario—another individual who invested with Quintiliani—in which they discussed Quintiliani's transactions and expressed concerns that Cessario's investments were not legitimate and that Quintiliani was not being forthright. During one conversation, the defendant and Cessario "kind of laugh[ed]" about the

fact that Cessario's investment with Quintiliani was not going to come to fruition. Cessario told the defendant that he believed that his whole investment was a scam. The defendant never told the plaintiff about the content of this conversation. The defendant did not understand some of the transactions in which he represented Quintiliani, and he did not tell the plaintiff about this lack of understanding or that he had serious concerns about the transactions.

When the plaintiff inquired as to the status of his investments, the defendant told the plaintiff that he would take care of him and that he would be paid when the money came into the defendant's trustee account. The defendant told the plaintiff that the things happening in his investment with Quintiliani were "true," that he had nothing to worry about and that everything was "good." In one conversation regarding the plaintiff's investment with Quintiliani, the defendant told the plaintiff that $100 million would be produced from his investment.

The plaintiff relied on the letters from the defendant and his discussions with the defendant in deciding to contribute money to the various investments with Quintiliani. The funds that were supposed to be transferred to the defendant's account never arrived. The plaintiff never received a return payment for his investments. The defendant acknowledged that the Canadian bank transaction in which the plaintiff invested turned out to be a scam. The plaintiff did not discover that any of his investments with Quintiliani were a scam until sometime after Quintiliani died on October 11, 2008.

On May 31, 2012, the jury returned a verdict in favor of the plaintiff in the amount of $53,315.[2] On June 7,

---

[2] After assessing the relative negligence of the parties, the jury attributed 30 percent of the negligence to the plaintiff, which, in turn, reduced the plaintiff's damages award by the same percentage amount to $37,320.50.

2012, the defendant filed a motion for remittitur, a motion to set aside the verdict and a motion for judgment notwithstanding the verdict. On June 19, 2012, the court denied the defendant's three postverdict motions and rendered judgment in favor of the plaintiff in accordance with the jury's verdict. On the same day, the defendant appealed from the judgment of the court in which it accepted the jury's verdict. On July 31, 2012, the defendant amended his appeal to include a challenge to the judgment of the court denying his three June 7, 2012 postverdict motions. The amended appeal is presently before us. Additional facts will be set forth as necessary.

## I

The defendant first claims that the court erred by denying his motion for a mistrial after the plaintiff's counsel violated the court's order precluding any testimony or evidence referring to Nigeria or the phrase "Nigerian bank scam." Specifically, the defendant claims that he was deprived of a fair trial when the court improperly allowed the plaintiff to publish to the jury and question a witness regarding an exhibit which contained references to Nigeria and a Nigerian bank in violation of the court's order. We are not persuaded.

The following additional facts are relevant to our resolution of this claim. On May 23, 2012, the defendant filed a motion in limine requesting that the court prohibit the plaintiff from "referring to or entering into evidence any information, testimony or documents [referring] to the term 'Nigerian Bank Scam' or similar." In his motion, the defendant stated that "[i]n all letters the defendant wrote to the plaintiff, reference was only made to the Canadian Imperial Bank of Commerce . . . never was any reference made to any other bank." He claimed that any reference to "Nigerian Bank Scam" or "similar" would cause the jury to be unduly prejudiced against him, would confuse the jury as to what the

letters written from the defendant to the plaintiff truly purported and would inordinately inflame the passions of the jury against the defendant. Further, the defendant claimed that "[b]y limiting [the] evidence to the claims relating to the letters the defendant wrote to the plaintiff that reference only the [Canadian Imperial Bank of Commerce], [the trial court] will assure the defendant is afforded a fair trial . . . ."[3]

On May 24, 2012, the court addressed the defendant's motion, and the following colloquy took place outside the presence of the jury:

"The Court: I understand the allegation that, if true, would seem to be negligent misrepresentation. . . . But, I am well aware that the word, 'Nigerian,' is very well known as a place where scams take place. And I think it would be prejudicial to get into that. He doesn't really—I mean, [in a letter the defendant wrote, dated June 30, 2009] there you say . . . 'After Mr. Quintiliani's untimely death it was determined that he had been the victim of an Internet scam.' But, that doesn't say anything about Nigeria.

"[The Plaintiff's Counsel]: . . . Your Honor, I don't intend to use the word Nigeria. Although there are documents allegedly from Nigeria in [the defendant's] file, and we'll get into those during evidence. But I don't intend to use the words, 'Nigerian bank scam.' But I think to prevent me from using the term, 'bank scam,' or 'Internet scam' . . . .

---

[3] Although we do not have the transcripts of the voir dire conducted in this case, the record before us reflects that, during voir dire, the plaintiff inquired of jurors as to their experience or knowledge regarding Nigerian bank scams and that the defendant did not object at that time. Moreover, during an exchange between the defendant's counsel and the court, the defendant's counsel stated that he "didn't have a problem with" the voir dire questions that mentioned the phrase "Nigerian bank scam" because he wanted to "see how [the jury] would react . . . ."

"The Court: . . . Well, I don't see a problem with that. . . . Your motion in limine is as to Nigerian bank scam.

"[The Defendant's Counsel]: . . . [I]f that's the position, then, obviously, we have an agreement. . . . But I do have a problem if the claim is that somehow those letters and any representations he made, you know, at least from what I've seen in the evidence, connect anything to Nigeria; I think it's this Canadian bank, and that's it . . . .

"The Court: I'm going to grant this motion in limine, no reference to Nigeria or Nigerian bank scam."

While questioning the defendant on the first day of trial, the plaintiff's counsel offered into evidence exhibit 10, a financial transfer slip referencing $30.5 million that supposedly was to be transferred into the defendant's client funds account for Quintiliani. The exhibit had the heading "Central Bank of Nigeria" and contained several other references to the country of Nigeria. The exhibit was offered as a document that was in the defendant's file on Quintiliani and that, by its very appearance, should have given him notice of the questionable nature of Quintiliani's transactions. The defendant's counsel objected, in part, based on the court's ruling on the motion in limine and argued that the exhibit was potentially prejudicial. The court overruled the defendant's objection and admitted the document as a full exhibit after stating to the jury: "[I]t comes in not for the truth of what is on here, but just for the fact that it was in [the defendant's] file, so he has knowledge of it, that's all. That's the only point of it." After the exhibit was admitted, the exhibit was published to the jury by means of projecting the image on a screen. The plaintiff's counsel then asked the defendant the following question: "[T]his was a document purportedly from the

Central Bank of Nigeria?" Shortly thereafter, the defendant's counsel stated that the jury should be able to see the whole exhibit.

The plaintiff's counsel then offered exhibit 11, another financial transfer slip from Quintiliani referencing $4 million that was to be deposited into an account for the defendant. The exhibit contained the word "Nigeria." Outside the presence of the jury, the defendant's counsel objected, claiming a lack of relevance. The defendant's counsel also stated: "One of the reasons that I asked the court to rule on that motion in limine is because, as we all know, and we discussed on the record, Your Honor, the term—this issue here involved a Canadian bank. So, to infect the claim with some kind of, you know, impression that there is some Nigerian stuff going on in the background I think is very prejudicial to my client, and His Honor moved to keep that out and I appreciate that."

The court then stated: "[T]he motion in limine that I granted was not to talk about the Nigerian scam. I think you can still get into the fact that it comes from the Central Bank of Nigeria . . . ." Following some further discussion about the probative value of the exhibit, the following colloquy took place:

"The Court: All right. On plaintiff's exhibit 11, the objection is sustained. I don't like the fact that it's from Nigeria. In view of my ruling, I know the ruling before was on the—was on the Nigerian bank scam, but he says, 'Or similar.' And everyone knows that Nigeria is very generally a scam; it's common knowledge. And on plaintiff's exhibit 10, I'm reversing my ruling and that is no longer a full exhibit. Exhibit 10 that was a full exhibit is now no longer, and the objection is sustained on that and on 11.

"[The Plaintiff's Counsel]: Your Honor, am I to understand that if the words 'Nigeria' or 'Nigerian' are

redacted from those exhibits that they would then be acceptable?

"The Court: Yes."

After ordering the redaction of all references to Nigeria in the exhibits at issue, the court stated: "I'm more concerned about Nigeria because it may not say Nigerian scam, but it's Nigeria, and I think members of the jury probably know that Nigeria is known as a scam." The court allowed the redacted versions of exhibits 10 and 11 to come into evidence.

At the beginning of the second day of trial, the defendant's counsel moved for a mistrial based on the fact that the jury had seen the term "Central Bank of Nigeria" on the unredacted version of exhibit 10 while the plaintiff's counsel questioned the defendant. The court responded by stating: "[N]o objection in my mind was made to the word, 'Nigeria,' prior to my saying what I did about redaction. But, even so, I don't think—I agree with what I did because I think it could be prejudicial, but I don't think it rises to the issue or the fact of granting a mistrial."

We begin by setting forth the applicable standard of review governing the defendant's first claim. "Although the remedy of a mistrial is permitted under the rules of practice, it is not favored. [A] mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial . . . and the whole proceedings are vitiated. . . . If curative action can obviate the prejudice, the drastic remedy of a mistrial should be avoided. . . .

"Appellate review of a trial court's decision granting or denying a motion for a [mistrial] must take into account the trial judge's superior opportunity to assess the proceedings over which he or she has personally

presided. . . . Thus, [a] motion for a [mistrial] is addressed to the sound discretion of the trial court and is not to be granted except on substantial grounds. . . . In [its] review of the denial of a motion for [a] mistrial, [our Supreme Court has] recognized the broad discretion that is vested in the trial court to decide whether an occurrence at trial has so prejudiced a party that he or she can no longer receive a fair trial. The decision of the trial court is therefore reversible on appeal only if there has been an abuse of discretion." (Citation omitted; internal quotation marks omitted.) *State* v. *Reilly*, 141 Conn. App. 562, 568, 61 A.3d 598 (2013).

The defendant argues that the court abused its discretion in denying his motion for a mistrial because the admission of the unredacted version of exhibit 10 violated the court's ruling on his motion in limine such that it prejudiced his ability to receive a fair trial. He argues that the prejudicial effect of the exhibit was demonstrated by the court's order on the motion in limine and the court's repeated comments regarding the prejudicial effect of the word "Nigeria." Further, he argues that the plaintiff's counsel's reference to the Central Bank of Nigeria during his questioning of the defendant violated the ruling on the motion in limine and prejudiced his ability to receive a fair trial. The plaintiff argues that the defendant's motion for a mistrial was misplaced in that the court's order regarding the motion in limine was not violated because the order was limited to the phrase "Nigerian bank scam," rather than any reference to the country of Nigeria. The plaintiff also argues that the defendant has failed to show that the introduction of the unredacted exhibit so prejudiced him that he could not receive a fair trial.[4] We agree that

---

[4] The plaintiff also argues that the defendant waived his right to appeal by failing to timely object for the reasons he now raises on appeal. We disagree that the defendant failed to object timely, as his counsel specifically raised the court's ruling on the motion in limine and argued that exhibit 10 was unduly prejudicial. Accordingly, the defendant properly has preserved his claim for our review.

the defendant has failed to demonstrate that he was so prejudiced as to be deprived of a fair trial.

Preliminarily, the record reflects that, at the time the court was considering the defendant's objection to exhibit 10, there was some confusion about the language that was precluded by the court's order on the motion in limine, possibly due to the fact that the court's initial order granted the defendant broader protection than he had requested in his motion. In granting the motion in limine, however, the court stated that it thought the word "Nigerian" would be prejudicial and that there was to be "no reference to Nigeria or Nigerian bank scam." Therefore, the publication of the unredacted exhibit and the plaintiff's counsel's question referring to Nigeria constituted a violation of the court's order on the motion in limine. Consistent with its initial ruling on the motion in limine, the court also ordered the redaction of all references to the country of Nigeria after ruling on the defendant's objection to exhibit 11.

We conclude that, even to the extent that the plaintiff's counsel violated the court's order, any such violation did not so prejudice the defendant that he was unable to receive a fair trial. Although the unredacted version of the exhibit was published to the jury temporarily on a screen and the plaintiff's counsel asked one question that mentioned the country of Nigeria, shortly thereafter, the court ordered all references to Nigeria to be redacted from exhibit 10 and subsequent exhibits before they were given to the jury. Further, before the exhibit was redacted, the defendant's counsel requested that the jury be allowed to see the whole exhibit, which undermines the defendant's claim that the jury's brief exposure to the exhibit deprived the defendant of a fair trial. Similarly, the defendant's claim of prejudice is further undermined by the fact that his counsel failed to object to the plaintiff's counsel's use of the phrase "Nigerian bank scam" during the voir dire of the jury.

The record also reflects that, after the court's evidentiary rulings, there were no further references to Nigeria in the presence of the jury.[5] Therefore, the court properly concluded that any prejudice that may have been created by the publication of the exhibit and the plaintiff's counsel's question about the same did not rise to the level that would warrant a mistrial. To demonstrate reversible error, it is not sufficient for the defendant merely to show that an evidentiary order was violated; instead, he must demonstrate that such an occurrence deprived him of a fair trial. See *State* v. *Reilly*, supra, 141 Conn. App. 568. While we recognize that any violation of a court order is improper, we are not persuaded that, in the context of the present case, *any* reference to the country of Nigeria was a per se prejudicial act that likely would arouse the emotions of the jury. Accordingly, the court did not abuse its discretion in denying the defendant's motion for a mistrial.

## II

The defendant next claims that the court improperly admitted into evidence several exhibits over his objection, such that he was deprived of a fair trial. Specifically, the defendant claims that he was prejudiced by the admission of fourteen different exhibits because they were irrelevant or lacked the proper foundation for admission into evidence. We are not persuaded.

The following additional facts are relevant to our resolution of this claim. When the plaintiff offered letters authored by the defendant relating to his representation of Quintiliani as exhibits 1 through 6, the defendant objected, claiming that the letters were not relevant and that there was no foundation to establish that the plaintiff relied on the letters to his detriment.

---

[5] In addition, we note that other evidence unrelated to Nigeria was admitted for the similar purpose of proving that the defendant knew or should have known that Quintiliani's investment plans were not legitimate.

The court overruled the defendant's objection with respect to exhibits 1, 3, 4, 5 and 6 and admitted those letters subject to the plaintiff testifying that he relied on them. The court also stated: "Because this is a letter from [the defendant] . . . there's no question as to foundation; it's his or a copy of his letter."

At the end of the plaintiff's case-in-chief, the defendant's counsel renewed his objections to the letters and moved to strike the exhibits. The court denied the motion after stating: "As far as the foundation is concerned, I agree with [the plaintiff's counsel] that it's an admission against party interest. So far as its relevance and the issue in negligent misrepresentation, he has to rely on it. I think evidence has been . . . presented that shows that [the plaintiff] relied on all of these letters. . . . What should [the defendant] have done; that's for the jury to decide whether he was negligent in those regards." With respect to exhibit 2, the court stated: "Well, [the defendant] sent a letter to his client to be utilized by his client. The obvious inference is that the client could send it out as a statement by [the defendant] that upon payment of $22,500 . . . Quintiliani will get $5 million. I think it goes to the weight, not the admissibility. The objection is overruled."

The plaintiff's counsel also offered three official documents—exhibits 10, 11 and 12[6]—that the defendant testified he received from Quintiliani. The defendant's counsel objected to each exhibit, claiming that they were not relevant. When it initially admitted exhibit 10, the court stated to the jury that "it comes in not for the truth of what is on here, but just for the fact that it was in [the defendant's] file, so he has knowledge of

---

[6] Exhibit 12 was another financial transfer slip referencing $4 million that was to be deposited into an account for the defendant.

it, that's all. That's the only point of it."[7] After addressing the defendant's counsel's objection based on the court's order on the motion in limine, as discussed in part I of this opinion, the court considered his relevance objection and stated: "I think it is relevant to the fact that [the defendant] had in his files a '[n]ot paid,' and he's testified to that on exhibit 10 and exhibit 11. I don't know that he's testified, yet, but I assume that he will testify that he never got the $4 million. But I think that shows that, at least, on the dates you don't know what date it was turned over to him by . . . Quintiliani. But you have to assume that it was certainly before the September date because one was July 15 and the other was the remittance date [of] April 7. So, I will allow 10 and 11, if [the appropriate redactions are made]." The court also admitted exhibit 12 and stated: "[O]kay. I want to make sure the jury understands that this is being offered not for the truth of it, because otherwise it would be hearsay, and so if you look at it you're not to take what's written there as truth. What it is offered for is to show that these documents were in [the defendant's] file and that he was aware from these—should have been aware from these documents, that the moneys were never paid."

The plaintiff's counsel offered, as exhibit 14, the previously referenced fax in which the defendant referred to his representation of Quintiliani in connection with a transaction in which Quintiliani agreed to pay the third party $2 million in exchange for the third party's payment of $225,000 needed to secure the release of $30 million. The defendant's counsel objected, claiming that the exhibit was not relevant. The court overruled the objection and admitted the exhibit in light of its

[7] As noted in part I of this opinion, the court reversed its initial ruling as to exhibit 10 in light of the defendant's counsel's objection regarding the motion in limine. Thereafter, the court admitted the exhibit into evidence with the appropriate redactions.

earlier ruling outside the presence of the jury in which the court found that the basis for the defendant's counsel's relevance objection went to the weight of the exhibit, not to its admissibility.

The plaintiff's counsel also offered the previously referenced attachments—exhibits 15 through 18—that accompanied the fax written by the defendant.[8] The attachments purported to be official documents that supposedly were required for the release of the funds. The fax and certificates were offered to demonstrate that the defendant should have known Quintiliani's financial transactions were not legitimate in light of the numerous typographical and grammatical errors in the documents, which suggested they were fake. The defendant's counsel objected to the admission of exhibit 16 on the ground of relevance. The court overruled the objection.

We first set forth the applicable standard of review and applicable law governing the defendant's second claim. "[O]ur standard of review regarding challenges to a trial court's evidentiary rulings is that these rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice. . . . In reviewing claims that the trial court abused its discretion, great weight is given to the trial court's decision and every reasonable presumption is given in favor of its correctness. . . . We will reverse the trial court's ruling only if it could not reasonably conclude as it did." (Internal

---

[8] The defendant's counsel specifically stated that he had no objection to the admission of exhibits 15, 17 and 18 when they were offered. Therefore, the defendant failed to preserve the claim he now raises on appeal challenging the court's admission of these exhibits. Accordingly, we decline to review the defendant's claim regarding these exhibits. State v. Mercado, 139 Conn. App. 99, 106, 54 A.3d 633 ("[a]ssigning error to a court's evidentiary rulings on the basis of objections never raised at trial unfairly subjects the court and the opposing party to trial by ambush" [internal quotation marks omitted]), cert. denied, 307 Conn. 943, 56 A.3d 951 (2012).

quotation marks omitted.) *Romprey* v. *Safeco Ins. Co. of America*, 129 Conn. App. 481, 492, 21 A.3d 889, cert. granted on other grounds, 302 Conn. 934, 28 A.3d 991 (2011). "All *relevant* evidence is admissible . . . ." (Emphasis added.) Conn. Code Evid. § 4-2. "Relevant evidence means evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence." (Internal quotation marks omitted.) Conn. Code Evid. § 4-1.

We conclude that the court did not abuse its discretion by admitting the exhibits at issue in this claim. Each of the exhibits to which the defendant's counsel objected was sufficiently probative of a material issue in the plaintiff's claim of negligent misrepresentation to satisfy the minimum evidentiary threshold of relevance. With respect to the letters admitted as exhibits 1 through 6, we agree with the court's conclusion that enough evidence had been presented to establish that the plaintiff relied on the letters to his detriment. We also agree that the plaintiff's counsel had established a sufficient foundation for each letter, as the defendant testified that he wrote each letter to the plaintiff or to Quintiliani, and the plaintiff testified that he relied on them in deciding to invest with Quintiliani. The court reasonably could have concluded that the remaining exhibits were all relevant to the plaintiff's claims that the defendant knew or should have known that Quintiliani's investment plan was not legitimate and that he did not take reasonable care in making representations to the plaintiff. Making every reasonable presumption in favor of the correctness of the evidentiary rulings, we conclude that the court did not abuse its discretion.

### III

The defendant also claims that the court improperly denied his motion for remittitur when the jury's award

of damages improperly included an amount of money that the plaintiff invested with Quintiliani when it was not disclosed previously in discovery. Specifically, the defendant claims that the jury's award included this amount even though it was prohibited by an earlier ruling from the court that barred the plaintiff from claiming in damages a particular payment he made which was not disclosed in his responses to the defendant's discovery request. We disagree.

The following additional facts are relevant to our resolution of this claim. During the direct examination of the plaintiff, when asked how much money he gave to Quintiliani after speaking with the defendant in November, 2007, the plaintiff provided the following testimony: "I don't know, maybe [$15,000 to $20,000], you know, like, five, three at a time and everything," and, "[a]fter November, like . . . $20,000. It could be $20,000, $25,000, I don't know." Later during his examination, the following colloquy took place before the jury:

"The Court: Okay. Ladies and gentlemen, I have admitted plaintiff's exhibit 19, which is apparently a transfer of $7900. So, you can inquire about that. . . .

"[The Plaintiff's Counsel]: Rosario, I'm going to show you exhibit 19, which is now a full exhibit, and you told us earlier that you recognize it as your wire transfer?

"[The Plaintiff]: Yeah. . . .

"[The Plaintiff's Counsel]: Okay. And who, if anyone, did you rely on when you made your decision to wire that money?

"[The Plaintiff]: This other decision I made because . . . . I [talked] to [the defendant] [in] November and . . . [in] March . . . when I [saw] him in [person]."

The plaintiff also testified that, in March, 2008, he wired $20,815 from his bank account to China or England and that he relied on the defendant in deciding to do so. When asked about documentation of yet another transfer of money from the plaintiff's bank account, the plaintiff testified that he transferred $22,500 to China and that he relied on the defendant in deciding to do so. In addition, the plaintiff testified that, on September 25, 2008, he left $2200 with the defendant for Quintiliani after the defendant said that they needed $2200 to get a release of $2 million.

The plaintiff's counsel also offered into evidence one of the plaintiff's bank statements and questioned him about a $7800 cash withdrawal on April 15, 2008, that was reflected on his bank statement. In response, the defendant's counsel objected, and the following colloquy ensued:

"[The Defendant's Counsel]: Well, Your Honor, my objection is that the discovery that we got had no mention of this particular amount. And we can talk about it because I can show the discovery to counsel. No mention, and it didn't. . . .

"[The Plaintiff's Counsel]: Well, Your Honor, these exhibits were [disclosed] long before trial. They have all been.

"[The Defendant's Counsel]: Not that one.

"The Court: Excuse me. I'm admitting the document. I can change that when you two fellows go over it, on your own, not while we are all waiting on you.

"[The Defendant's Counsel]: Understood, Judge.

"The Court: Determine whether or not the plaintiff complied with the discovery orders to turn that over. If the answer is no, then you can have it in there but the question is, you can't claim it as a damage."

Subsequently, the plaintiff testified that he withdrew the $7800 and gave that amount to Quintiliani because an earlier wire transfer did not go through.[9] The defendant's counsel did not request that references to the $7800 withdrawal be redacted from the exhibit or that the jury be instructed not to consider the withdrawal in its evaluation of damages. During his closing argument, the plaintiff's counsel did not refer to the $7800 when he enumerated the plaintiff's damages. In its order denying the defendant's motion for remittitur, the court stated only the following: "Once liability [was] found, [the] amount was reasonable."

We first set forth the applicable standard of review and legal principles governing the defendant's third claim. General Statutes § 52-216a provides in relevant part: "If the court at the conclusion of the trial concludes that the verdict is excessive as a matter of law, it shall order a remittitur and, upon failure of the party so ordered to remit the amount ordered by the court, it shall set aside the verdict and order a new trial. . . ." Our Supreme Court "repeatedly [has] stated that the award of damages, in particular, is a matter peculiarly within the province of the trier of facts. . . . For that reason, we consistently have held that a court should exercise its authority to order a remittitur rarely—only in the most exceptional of circumstances. . . .

"In determining whether to order remittitur, the trial court is required to review the evidence in the light most favorable to sustaining the verdict. . . . Upon completing that review, the court should not interfere with the jury's determination except when the verdict

---

[9] The plaintiff testified that, on April 11, 2008, he wired $7900 from his bank account to another account in reliance on the defendant's representations that such transfer was necessary to pay for a tax. This amount was credited back to his account on April 15, 2008. The plaintiff acknowledged the $100 difference between the amounts but testified that he gave the $7800 cash payment to Quintiliani for the same purpose as the $7900 wire transfer.

is plainly excessive or exorbitant. . . . The ultimate test which must be applied to the verdict by the trial court is whether the jury's award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury [was] influenced by partiality, prejudice, mistake or corruption. . . . The court's broad power to order a remittitur should be exercised only when it is manifest that the jury [has] included items of damage which are contrary to law, not supported by proof, or contrary to the court's explicit and unchallenged instructions. . . .

"[T]he decision whether to reduce a jury verdict because it is excessive as a matter of law [within the meaning of § 52-216a] rests solely within the discretion of the trial court . . . . [Consequently], the proper standard of review of a trial court's decision to grant or deny a motion to set aside a verdict as excessive as a matter of law is that of an abuse of discretion. . . . Accordingly, the ruling of the trial court on the motion to set aside the verdict as excessive is entitled to great weight and every reasonable presumption should be given in favor of its correctness." (Citations omitted; internal quotation marks omitted.) *Saleh* v. *Ribeiro Trucking, LLC*, 303 Conn. 276, 280–82, 32 A.3d 318 (2011).

The defendant argues that the jury improperly included in its damages calculation the $7800 cash withdrawal reflected on the plaintiff's bank statement, which the defendant claims was not disclosed by the plaintiff in discovery. He argues that the jury's damages award must have included this amount because, without it, the jury only had before it evidence of $45,515 in damages. The plaintiff argues that, in addition to the $7800 to which the defendant refers, there was sufficient evidence to demonstrate that, in reliance on the defendant's representations, the plaintiff sustained

an amount in damages that exceeded the jury award. He argues, therefore, that the jury award did not necessarily include the challenged $7800. We agree with the plaintiff.

On the basis of our thorough review of the record, we conclude that the court did not abuse its discretion by denying the defendant's motion for remittitur. The jury had before it documentation and testimony from the plaintiff that, in reliance on the defendant's representations, he disbursed between $15,000 and $25,000 in November, 2007; $20,815 in March, 2008; $22,500 on April 16, 2008; and $2200 on September 25, 2008. The total of these amounts ranges from $60,515 to $70,515 and did not necessarily include the challenged $7800. As the plaintiff correctly notes, the amount of the jury's damages award was well under this range of expenditures and, therefore, could have been calculated without any consideration of the $7800.[10] Moreover, even if the jury relied on the $7800 cash withdrawal in calculating its award of damages, we disagree with the defendant's characterization of the court's ruling on the plaintiff's bank statement and conclude that the jury properly could have considered the withdrawal in its assessment of damages. The court specifically admitted the bank statement into evidence, but then precluded the plaintiff's counsel from discussing in his closing argument the $7800 referenced on the statement to the extent that counsel had failed to disclose it during discovery. Further, the defendant's counsel did not request a redaction of references to the $7800 or a curative instruction from the court. Although it was not mentioned in the plaintiff's closing argument, the jury still had before it the plaintiff's bank statement showing the $7800 cash withdrawal and the plaintiff's testimony that

[10] We also note that the record reflects that no interrogatories were submitted to the jury on the issue of damages and, therefore, we can only speculate as to why the jury awarded the damages it did. We decline to do so.

he gave that amount to Quintiliani to replace an earlier failed wire transfer that he attempted to make in reliance on the defendant's representations. There is nothing in the record to suggest that the jury included items of damages that were contrary to the court's instructions or unsupported by proof or that the jury was influenced by partiality, prejudice, mistake or corruption in calculating its award of damages. Accordingly, we conclude that the court did not abuse its discretion.

IV

The defendant also claims that the court improperly denied his motions to set aside the verdict and for judgment notwithstanding the verdict. The defendant claims that the court erred in denying his motions because the plaintiff failed to meet the requisite burden of proof to sustain a claim for negligent misrepresentation. Specifically, the defendant claims that the plaintiff failed to produce evidence of false statements by the defendant, of reliance by the plaintiff on such statements or of damages suffered by the plaintiff due to his reliance on misrepresentations of the defendant. We are not persuaded.

"The proper appellate standard of review when considering the action of a trial court in granting or denying a motion to set aside a verdict is the abuse of discretion standard. . . . In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only [when] an abuse of discretion is manifest or [when] injustice appears to have been done. . . . [T]he role of the trial court on a motion to set aside the jury's verdict is not to sit as [an added] juror . . . but, rather, to decide whether, viewing the evidence in the light most favorable to the prevailing party, the jury could reasonably have reached the verdict that it did. . . . In reviewing the action of

the trial court in denying [or granting a motion] . . . to set aside the verdict, our primary concern is to determine whether the court abused its discretion . . . . The trial court's decision is significant because the trial judge has had the same opportunity as the jury to view the witnesses, to assess their credibility and to determine the weight that should be given to [the] evidence. Moreover, the trial judge can gauge the tenor of the trial, as [this court], on the written record, cannot, and can detect those factors, if any, that could improperly have influenced the jury." (Citations omitted; internal quotation marks omitted.) *Hall* v. *Bergman*, 296 Conn. 169, 179, 994 A.2d 666 (2010). "Our standard of review for . . . motions to set aside a verdict and motions for judgment notwithstanding the verdict [is] the same." (Internal quotation marks omitted.) *Medcalf* v. *Washington Heights Condominium Assn., Inc.*, 57 Conn. App. 12, 15 n.2, 747 A.2d 532, cert. denied, 253 Conn. 923, 754 A.2d 797 (2000).

"Our Supreme Court has long recognized liability for negligent misrepresentation. [It has] held that even an innocent misrepresentation of fact may be actionable if the declarant has the means of knowing, ought to know, or has the duty of knowing the truth. . . . The governing principles are set forth in similar terms in § 552 of the Restatement Second of Torts (1977): One who, in the course of his business, profession or employment . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their *justifiable reliance* upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information. . . . Accordingly, an action for negligent misrepresentation requires a plaintiff to prove that (1) the defendant made a misrepresentation and (2) the plaintiff reasonably

relied upon that misrepresentation. . . . Whether evidence supports a claim of . . . negligent misrepresentation is a question of fact." (Emphasis in original; internal quotation marks omitted.) *Savings Bank of Manchester* v. *Ralion Financial Services, Inc.*, 91 Conn. App. 386, 389–90, 881 A.2d 1035 (2005).

After thoroughly reviewing the record, we conclude that the jury reasonably could have reached its verdict after finding that the plaintiff sustained a pecuniary loss by reasonably and justifiably relying on the misrepresentations of the defendant that the defendant knew or should have known were false. This finding is supported by ample evidence in the record, including the defendant's letters to the plaintiff about investing with Quintiliani; the plaintiff's testimony about his reliance on the defendant's written and verbal assurances regarding the legitimacy of Quintiliani's investment plans; testimony from Cessario about conversations in which he and the defendant discussed the illegitimacy of Quintiliani's investment plans; the error-laden documentation of Quintiliani's investments; and the plaintiff's testimony about the significant sums of money that he paid toward the investments for which he never received a return. Accordingly, we conclude that the court did not abuse its discretion in denying the defendant's motion to set aside the verdict and the motion for judgment notwithstanding the verdict.

V

Finally, the defendant claims that the court erred by failing to conclude that the plaintiff's claims were barred by the applicable statute of limitations set forth in General Statutes § 52-584.[11] Specifically, the defendant claims that the court erred in failing to conclude

---

[11] General Statutes § 52-584 provides in relevant part: "No action to recover damages for injury to the person, or to real or personal property, caused by negligence . . . shall be brought but within two years from the date when the injury is first sustained or discovered or in the exercise of reasonable care should have been discovered, and except that no such action may be brought

that the statute of limitations barred the plaintiff's claim because the plaintiff failed to provide any evidence of a continuing course of conduct or evidence that the defendant owed a duty to the plaintiff. We decline to review the merits of the defendant's claim.

The defendant has failed to identify any specific ruling by the court regarding the statute of limitations issue that he now raises on appeal. Further, we are unable to glean any such ruling from the record because the statute of limitations issue was, *without objection*, properly submitted to and decided by the jury.[12] The defendant appears to claim that the mere absence of a ruling that the statute of limitations barred the plaintiff's claim demonstrated error by the court. Because he has failed to identify any discrete ruling by the court challenged on appeal and has not provided any analysis regarding the correctness of such a ruling, the defendant's claim is inadequately briefed. Accordingly, we decline to review the merits of his claim. *Carrillo* v. *Goldberg*, 141 Conn. App. 299, 307 n.7, 61 A.3d 1164 (2013) ("For this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs. We do not reverse the judgment of a trial court on the basis of challenges to its rulings that have not been adequately briefed." [Internal quotation marks omitted.]).

The judgment is affirmed.

In this opinion the other judges concurred.

more than three years from the date of the act or omission complained of, except that a counterclaim may be interposed in any such action any time before the pleadings in such action are finally closed."

[12] The court instructed the jury on the defendant's statute of limitations special defense in which the defendant claimed that the plaintiff violated the applicable statute of limitations set forth in § 52-584. The court also instructed the jury on the plaintiff's response to the defendant's special defense in which the plaintiff claimed that the statute of limitations was tolled by a continuing course of conduct.