******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# ORSON D. MUNN III ET AL. *v.* THE HOTCHKISS SCHOOL
## (SC 19525)

Rogers, C. J., and Palmer, Eveleigh, McDonald and Espinosa, Js.

*Syllabus*

The plaintiff, a student at the defendant private boarding school, brought a negligence action in federal court to recover damages resulting from injuries that she sustained after she had contracted tick-borne encephalitis on an educational trip to China organized by the defendant. Prior to the trip, one of the defendant's employees, who served as the director of the defendant's international programs and who provided the students who were traveling to China with information about the trip, viewed on the website for the United States Center for Disease Control and Prevention information concerning travel to China. That information included a warning that tick-borne encephalitis occurred in the forested region of China where the students would be traveling and an instruction to travelers that the disease could be prevented by taking certain precautions to protect against insect bites. The plaintiff claimed that the defendant had been negligent by, inter alia, failing to warn students going on the trip and their parents of the risk of exposure to tick-borne encephalitis, and by failing to ensure that the students took protective measures against insect bites to prevent contracting that disease. During the trip, the students visited a certain mountain in an area of China where the website had reported that tick-borne encephalitis was present, and the defendant did not warn the students to take precautions to protect against insect bites. After the group of students ascended the mountain, the plaintiff and a small group of other students became lost in the woods when they were allowed to descend the mountain by themselves. The plaintiff received insect bites and, ten days later, began to experience the first symptoms of tick-borne encephalitis. She subsequently became partially paralyzed and semicomatose, but, thereafter, her condition stabilized and improved. As a result of her illness, the plaintiff cannot speak, has limited dexterity in her hands that prevents her from typing, and has limited control over her facial muscles causing her to drool, to have difficulty eating and swallowing, and to exhibit socially inappropriate facial expressions. Furthermore, although the plaintiff remains intelligent, she has compromised brain functioning that inhibits her ability to utilize that intelligence. The jury awarded the plaintiff $41.75 million in damages, of which $31.5 million constituted noneconomic damages, and the United States District Court for the District of Connecticut rendered judgment thereon for the plaintiff. The defendant appealed to the Second Circuit Court of Appeals, which concluded that there was sufficient evidence presented at trial for the jury to find that the plaintiff's illness was foreseeable. The Second Circuit then certified questions to this court as to whether Connecticut public policy supported imposing a duty on a school to warn about or to protect against the foreseeable risk of a serious insect-borne disease when it organizes a trip abroad and whether the noneconomic portion of the damages award warranted a remittitur. *Held*:

1. The public policy of Connecticut does not preclude imposing a duty on a school to warn about or to protect against the risk of a serious insect-borne disease when organizing a trip abroad, as it is widely recognized that schools generally are obligated to exercise reasonable care to protect students in their charge from foreseeable harms, and there was no compelling reason to create an exception in this case for foreseeable serious insect-borne diseases: the normal expectations of the participants in a school sponsored educational trip abroad involving minor children supported the imposition of a duty on the defendant to warn about and to protect against serious insect-borne diseases in the areas to be visited on the trip, as trip participants naturally would expect that a school will give appropriate warnings and use ordinary care with respect to serious insect-borne diseases in the particular areas to be visited; furthermore, the recognition that a school's general duty to

protect its students includes the responsibility to take reasonable measures to warn about and to protect against serious insect-borne diseases will not have a chilling effect on educational travel but will promote safety by ensuring that unnecessary risks are eliminated or reduced by appropriate warnings and protective measures; moreover, this court was skeptical that the recognition of this duty would lead to a substantial increase in litigation, as such a duty afforded students only the opportunity to prove negligence and did not create a new cause of action, but was one specific aspect of the already well established general duty of schools to take reasonable measures to ensure the safety of minors over whom they have assumed custody; in addition, contrary to the defendant's claim that there should be no duty to warn or to protect in the circumstances of this case because the probability of the plaintiff contracting tick-borne encephalitis was remote, the rarity of tick-borne encephalitis was not relevant to this court's public policy analysis and should be weighed by the fact finder when determining foreseeability.

2. The jury award to the plaintiff fell within the necessarily uncertain limits of just damages and did not warrant a remittitur: there was no allegation that the jury was prejudiced, incompetent or otherwise compromised, the District Court concluded that the jury was not motivated by undue sympathy, and only in the most rarest of circumstances should the size of the verdict alone warrant a remittitur; furthermore, the District Court, which was in a position to evaluate the testimony firsthand, did not improperly assess of the plaintiff's injuries as uniquely cruel, as she had completely lost the ability to have meaningful communication and interaction with people, and, given her long life expectancy and the fact that the physical effects of her injuries will worsen as she ages, her psychological condition will deteriorate over time; moreover, it would serve no useful purpose for this court to compare this verdict and this plaintiff's injuries to the verdicts and injuries in other cases, as the question of damages is one peculiarly within the province of the fact finder, and, in the absence of evident mistakes or partiality, this court deferred to the jury's judgment.

(*Two justices concurring separately in two opinions*)

Argued March 27—officially released August 11, 2017*

*Procedural History*

Action to recover damages for personal injuries sustained by the plaintiff Cara L. Munn as a result of the defendant's alleged negligence, and for other relief, brought to the United States District Court for the District of Connecticut and tried to the jury before *Underhill, J.*; verdict and judgment for the plaintiffs; thereafter, the court, *Underhill, J.*, denied the defendant's motion for judgment as a matter of law, motion for a new trial and motion to alter the judgment, and, pursuant to the parties' stipulation on collateral source reduction, rendered an amended judgment for the plaintiffs, from which the defendant appealed to the United States Court of Appeals for the Second Circuit, *Walker*, *Lynch* and *Lohier, Js.*, which certified certain questions of law to this court.

*Antonio Ponvert III*, with whom was *Alinor C. Sterling*, for the appellant (defendant).

*Wesley W. Horton*, with whom were *Karen L. Dowd*, *Jeffrey R. Babbin* and, on the brief, *Kenneth J. Bartschi* and *Aaron S. Bayer*, for the appellees (plaintiffs).

*Renee W. Dwyer* and *Brian M. Paice* filed a brief for American Camp Association, Inc., et al. as amici curiae.

*Frank J. Silvestri, Jr.*, filed a brief for National Association of Independent Schools et al. as amici curiae.

*Opinion*

ROGERS, C. J. The issues in this case, which comes to us on certification from the United States Court of Appeals for the Second Circuit pursuant to General Statutes § 51-199b (d),[1] are: (1) Does Connecticut public policy support imposing a duty on a school to warn about or protect against the risk of a serious insect-borne disease when it organizes a trip abroad? (2) If so, does a damages award of approximately $41.5 million, $31.5 million of which are noneconomic damages, warrant a remittitur? We answer the first question in the affirmative and the second question in the negative.

The following facts, which find support in the record certified by the Second Circuit, and procedural history are relevant to our resolution of the certified issues.[2] The defendant, The Hotchkiss School, is a private boarding school located in Lakeville. At the time of the events underlying this appeal, the plaintiff, Cara L. Munn,[3] was a student there. In June and July of 2007, the plaintiff, who recently had turned fifteen years old and completed her freshman year, joined other students and faculty of the school on an educational trip to China. In July, she contracted tick-borne encephalitis, a viral infectious disease that attacks the central nervous system, as a result of being bitten by an infected tick during a hike on Mount Panshan, which is located in a forested area approximately sixty miles from Tianjin, a city in northeastern China. As a result of contracting tick-borne encephalitis, the plaintiff suffered permanent brain damage that has impacted severely the course of her life.

In 2009, the plaintiff filed a diversity action in the United States District Court for the District of Connecticut, alleging that the defendant had been negligent by, inter alia, failing to warn students and their parents of the risk of exposure to insect-borne diseases and failing to ensure that the students took protective measures against insect bites prior to visiting Mount Panshan. The case was tried to a jury in March, 2013. The jury returned a verdict in the plaintiff's favor, and it awarded her $10.25 million in economic damages and $31.5 million in noneconomic damages. The award was then reduced pursuant to a stipulated collateral source reduction.

The defendant thereafter challenged the verdict, moving for judgment as a matter of law; see Fed. R. Civ. P. 50 (b); or, alternatively, for a new trial. See Fed. R. Civ. P. 59. The District Court rejected each of the claims the defendant made in support of those motions, including that the plaintiff's infection with tick-borne encephalitis was unforeseeable, that public policy precluded the imposition of a legal duty on the defendant and that the noneconomic portion of the damages award was excessive as a matter of law. The defendant appealed

from the District Court's judgment to the Second Circuit Court of Appeals, challenging its determinations on each of those claims. The Second Circuit agreed with the plaintiff that there was sufficient evidence presented at trial for the jury to find that her illness was foreseeable; *Munn* v. *Hotchkiss School*, 795 F.3d 324, 330 (2d Cir. 2015); but, finding insufficient guidance in existing Connecticut law, certified to this court the issues of whether Connecticut public policy supports the imposition of a duty on a school to warn about or to protect against the foreseeable risk of a serious insect-borne disease when organizing a trip abroad and, if so, whether the jury's damages award, particularly the noneconomic portion, warranted a remittitur. Id., 337.

I

We first consider whether Connecticut public policy supports the imposition of a duty on a school to warn about or protect against the foreseeable risk of a serious insect-borne disease when it organizes a trip abroad. Because it is widely recognized that schools generally are obligated to exercise reasonable care to protect students in their charge from foreseeable dangers, and there is no compelling reason to create an exception for foreseeable serious insect-borne diseases, we conclude that the imposition of such a duty is not contrary to Connecticut public policy and, accordingly, answer the first certified question in the affirmative.

The following additional facts that the jury reasonably could have found in support of its verdict are relevant. In the spring of 2007, Jean Yu, the director of the defendant's Chinese language and culture program and the leader of the trip, and David Thompson, the director of the defendant's international programs, provided the students who would be traveling to China with information about the trip. A list of places that the students would be visiting included "Mount Pan"[4] as part of a Tianjin city tour. A subsequently distributed itinerary again listed "Mount Pan" as part of a city tour. The itinerary did not describe "Mount Pan" or indicate that the students would be visiting a forested area during the trip, which otherwise took place in urban or suburban settings.

The students and parents also received some written medical advice for the trip in an e-mail including a hyperlink to a United States Centers for Disease Control and Prevention (CDC) website that erroneously directed users to the page addressing Central America, rather than the one addressing China. The same document, as well as a generic predeparture manual produced by Thompson's office, indicated that the defendant's infirmary could serve as a travel clinic, although the infirmary was not qualified to provide travel related medical advice. Finally, a packing list provided to the students going on the China trip included "[b]ug spray or lotion (or bug spray wipes),"

but that item was listed only under the heading "Miscellaneous Items," along with other, seemingly optional things like "[t]ravel umbrella" and "[m]usical instrument." None of the foregoing documents provided any warning about insect-borne illnesses, although other health and medical issues, such as immunizations, prescriptions and sexually transmitted diseases, were discussed.

Prior to the trip, Thompson viewed the page on the CDC website directed at travelers to China. In its discussion of diseases found in the area, the page stated that "[tick borne] encephalitis occurs in forested regions in northeastern China and in South Korea. Protecting yourself against insect bites (see below) will help to prevent these diseases." A section that followed, captioned "Prevent Insect Bites," instructed travelers to use insect repellent containing the chemical compound DEET and to wear long sleeves and long pants when outdoors. At trial, Thompson admitted seeing this information at the time of the trip, and, although he initially contended to the contrary, he subsequently agreed that Tianjin is in northeastern China. Other travel information sources generally available at the time also reported that tick-borne encephalitis was present in northeastern China. See footnote 7 of this opinion. No one on behalf of the defendant, including Thompson, warned students or their parents about the presence of tick-borne encephalitis in forested regions of northeastern China or the need to protect against it.[5]

The students visited Mount Panshan about two weeks into the trip as part of a weekend excursion outside of Tianjin's city center. Evidence submitted at trial demonstrated that Mount Panshan is a forested peak adjacent to other smaller foothills, surrounded by an exurban landscape.[6] No one warned the students to wear clothing that would protect them against insect bites or to apply insect repellent before the trek up the mountain. The group ascended Mount Panshan together on a paved pathway, dressed in shorts and T-shirts or tank tops, but split up for the descent. Most students, teachers and chaperones rode a cable car down the mountain. The plaintiff and two or three other students, however, were permitted to walk down the mountain by themselves. On the way down, the plaintiff and her cohorts left the paved pathway and became lost, walking on narrow dirt trails, among trees and through brush before eventually rejoining the rest of the group. Along the way, the plaintiff received many insect bites and soon developed an itchy welt. Ten days later, she began to experience the first symptoms of tick-borne encephalitis.

We turn to the first certified question, which concerns the defendant's duty to the plaintiff. "Duty is a legal conclusion about relationships between individuals, made after the fact, and imperative to a negligence

cause of action. The nature of the duty, and the specific persons to whom it is owed, are determined by the circumstances surrounding the conduct of the individual. . . . Although it has been said that no universal test for [duty] ever has been formulated . . . our threshold inquiry has always been whether the specific harm alleged by the plaintiff was foreseeable to the defendant. The ultimate test of the existence of the duty to use care is found in the foreseeability that harm may result if it is not exercised. . . . By that [it] is not meant that one charged with negligence must be found actually to have foreseen the probability of harm or that the particular injury [that] resulted was foreseeable . . . . [T]he test for the existence of a legal duty entails (1) a determination of whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result, and (2) a determination, on the basis of a public policy analysis, of whether the defendant's responsibility for its negligent conduct should extend to the particular consequences or particular plaintiff in the case." (Internal quotation marks omitted.) *Ruiz* v. *Victory Properties, LLC*, 315 Conn. 320, 328–29, 107 A.3d 381 (2015).[7]

The second prong of the analysis is necessary because "[a] simple conclusion that the harm to the plaintiff was foreseeable . . . cannot by itself mandate a determination that a legal duty exists. Many harms are quite literally foreseeable, yet for pragmatic reasons, no recovery is allowed. . . . A further inquiry must be made, for we recognize that duty is not sacrosanct in itself . . . but is only an expression of the sum total of those considerations of policy [that] lead the law to say that the plaintiff is entitled to protection. . . . The final step in the duty inquiry, then, is to make a determination of the fundamental policy of the law, as to whether the defendant's responsibility should extend to such results. . . . [I]n considering whether public policy suggests the imposition of a duty, we . . . consider the following four factors: (1) the normal expectations of the participants in the activity under review; (2) the public policy of encouraging participation in the activity, while weighing the safety of the participants; (3) the avoidance of increased litigation; and (4) the decisions of other jurisdictions. . . . [This] totality of the circumstances rule . . . is most consistent with the public policy goals of our legal system, as well as the general tenor of our [tort] jurisprudence." (Citations omitted; internal quotation marks omitted.) Id., 336–37.

Before turning to the public policy analysis, we pause to examine the broader legal framework that encompasses the specific certified issue. Although the law of negligence typically does not impose a duty on one party to act affirmatively in furtherance of the protection of another, there are certain exceptions to that general proposition. See generally 2 Restatement (Third), Torts,

Liability for Physical and Emotional Harm §§ 37 through 44 (2012). One exception applies when there is a "special relationship" between those parties; id., § 40, pp. 39–40; and one example of such a special relationship that has received wide recognition, along with a concomitant duty to protect, is the relationship between schools and their students. See id., § 40 (b) (5), p. 40; see also, e.g, *Todd M.* v. *Richard L.*, 44 Conn. Supp. 527, 543, 696 A.2d 1063 (1995); *Boisson* v. *Arizona Board of Regents*, 236 Ariz. 619, 622–23, 343 P.3d 931 (App. 2015), review denied, Arizona Supreme Court, Docket No. CV-15-0121 (December 1, 2015); *Dailey* v. *Los Angeles Unified School District*, 2 Cal. 3d 741, 747, 470 P.2d 360, 87 Cal. Rptr. 376 (1970); *Hecksher* v. *Fairwinds Baptist Church, Inc.*, 115 A.3d 1187, 1206 (Del. 2015); *District of Columbia* v. *Royal*, 465 A.2d 367, 369 (D.C. 1983); *Rupp* v. *Bryant*, 417 So. 2d 658, 666 (Fla. 1982); *Doe Parents No. 1* v. *State Dept. of Education*, 100 Haw. 34, 74, 58 P.3d 545 (2002); *Bellman* v. *Cedar Falls*, 617 N.W.2d 11, 21 (Iowa 2000); *Beshears* v. *Unified School District No. 305*, 261 Kan. 555, 563, 930 P.2d 1376 (1997); *Williams* v. *Kentucky Dept. of Education*, 113 S.W.3d 145, 148 (Ky. 2003); *Prier* v. *Horace Mann Ins. Co.*, 351 So. 2d 265, 268 (La. App.), cert. denied, 352 So. 2d 1042, 1045 (La. 1977); *Eisel* v. *Board of Education*, 324 Md. 376, 384, 597 A.2d 447 (1991); *Brown* v. *Knight*, 362 Mass. 350, 352, 285 N.E.2d 790 (1972); *Henderson* v. *Simpson County Public School District*, 847 So. 2d 856, 857 (Miss. 2003); *Graham* v. *Montana State University*, 235 Mont. 284, 289, 767 P.2d 301 (1988); *A.W.* v. *Lancaster County School District 0001*, 280 Neb. 205, 216, 784 N.W.2d 907 (2010); *Marquay* v. *Eno*, 139 N.H. 708, 717, 662 A.2d 272 (1995); *Mirand* v. *New York*, 84 N.Y.2d 44, 49, 637 N.E.2d 263, 614 N.Y.S.2d 372 (1994); *Fazzolari* v. *Portland School District No. 1J*, 303 Or. 1, 19, 734 P.2d 1326 (1987); *Christensen* v. *Royal School District No. 160*, 156 Wn. 2d 62, 70, 124 P.3d 283 (2005); cf. General Statutes § 10-220 (a) (4) ("[e]ach local or regional board of education . . . shall provide an appropriate learning environment for all its students which includes . . . a safe school setting").

As to the rationale for imposing an affirmative duty to protect in this context, "[t]he relationship between a school and its students parallels aspects of several other special relationships—it is a custodian of students, it is a land possessor who opens [its] premises to a significant public population, and it acts partially in the place of parents." (Internal quotation marks omitted.) *Monroe* v. *Basis School, Inc.*, 234 Ariz. 155, 157, 318 P.3d 871 (App. 2014). As a general matter, "[o]ne . . . who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under [a duty to protect the other against unreasonable risk of physical harm]." 2 Restatement (Second), Torts § 314A (4), p. 118 (1965). At heart, "the duty [to protect] derives

from the simple fact that a school, in assuming physical custody and control over its students, effectively takes the place of parents and guardians . . . ." *Mirand* v. *New York*, supra, 84 N.Y.2d 49; see also 2 Restatement (Second), supra, § 320, comment (b), p. 131 ("[A] child while in school is deprived of the protection of his parents or guardian. Therefore, the actor who takes custody . . . of a child is properly required to give him the protection which the custody or the manner in which it is taken has deprived him.").[8]

"[T]he scope of the duty imposed by the student-school relationship is not limitless. . . . [T]he duty is tied to expected activities within the relationship. Therefore, in the student-school relationship, the duty of care is bounded by geography and time, encompassing risks such as those that occur while the student is at school or otherwise under the school's control." (Citation omitted; internal quotation marks omitted.) *Boisson* v. *Arizona Board of Regents*, supra, 236 Ariz. 623; see also *Strycharz* v. *Cady*, 323 Conn. 548, 579, 148 A.3d 1011 (2016) (rejecting, in public school immunity context, per se rule that would exempt school officials from liability for harm sustained during off campus school activities, such as educational field trips, and noting that "[p]arents who have relinquished control and custody of their children to the school rightly expect that the school will exercise reasonable care, as long as their children remain under the school's custody and control"); *Concepcion* v. *Archdiocese of Miami*, 693 So. 2d 1103, 1104 (Fla. App. 1997) ("a duty of supervision has been found for student injuries occurring [on school] premises as well as [off school] premises for school-related activities"). Outside of on campus occurrences during the regular school day, courts have found the duty applicable in such settings as school bus rides; see *Todd M.* v. *Richard L.*, supra, 44 Conn. Supp. 527, 543; *Doe* v. *DeSoto Parish School Board*, 907 So. 2d 275, 283 (La. App. 2005), cert. denied, 924 So. 2d 167 (La. 2006); athletic events; see *Limones* v. *School District*, 161 So. 3d 384, 391 (Fla. 2015); *Wagenblast* v. *Odessa School District No. 105-157-166J*, 110 Wn. 2d 845, 856, 758 P.2d 968 (1988); field trips; see *Bellman* v. *Cedar Falls*, supra, 617 N.W.2d 15, 17; off campus picnics; see *Brown* v. *Knight*, supra, 362 Mass. 350, 352; and off campus "[w]orkday" activities; *Travis* v. *Bohannon*, 128 Wn. App. 231, 234–35, 238–39, 115 P.3d 342 (2005); but not applicable to off campus occurrences that are unconnected with any school programming. See, e.g., *Boisson* v. *Arizona Board of Regents*, supra, 621, 624–25 (no duty to supervise college students' independently organized excursion to Mount Everest during study abroad trip to China); *Concepcion* v. *Archdiocese of Miami*, supra, 1105 (no duty to prevent after school fight that occurred on public sidewalk outside of school gates); *Anderson* v. *Shaughnessy*, 526 N.W.2d 625, 626 (Minn. 1995) (no

duty to prevent harm once student disembarked school bus safely at scheduled destination).

The potential harms to be protected against vary widely. They have included physical and sexual assaults by strangers, other students or school employees; see *Dailey* v. *Los Angeles Unified School District*, supra, 2 Cal. 3d 745–46; *Rupp* v. *Bryant*, supra, 417 So. 2d 660; *Doe Parents No. 1* v. *State Dept. of Education*, supra, 100 Haw. 42; *Doe* v. *DeSoto Parish School Board*, supra, 907 So. 2d 277; *A.W.* v. *Lancaster County School District 0001*, supra, 280 Neb. 206; *Marquay* v. *Eno*, supra, 139 N.H. 711; *Mirand* v. *New York*, supra, 84 N.Y.2d 47; *Fazzolari* v. *Portland School District No. 1J*, supra, 303 Or. 3; student suicide; *Eisel* v. *Board of Education*, supra, 324 Md. 377; accidents caused by students' drunk driving; *Williams* v. *Kentucky Dept. of Education*, supra, 113 S.W.3d 147; physical hazards; see *District of Columbia* v. *Royal*, supra, 465 A.2d 368 (partially disassembled fence); *Bellman* v. *Cedar Falls*, supra, 617 N.W.2d 15 (inadequately supervised golf cart); *Prier* v. *Horace Mann Ins. Co.*, supra, 351 So. 2d 267 (trash burner); *Brown* v. *Knight*, supra, 362 Mass. 350 (open fireplace); *Travis* v. *Bohannon*, supra, 128 Wn. App. 235–36 (hydraulic wood splitter); and aggravation of injuries suffered in a spontaneous medical emergency during a soccer game.[9] *Limones* v. *School District*, supra, 161 So. 3d 387.

Regarding the scope of the duty, standard negligence principles apply, within the context of the facts and circumstances of the particular case. "While [a] school is not an insurer of the safety of its students, it is obligated to exercise such care over students in its charge that a parent of ordinary prudence would exercise under comparable circumstances . . . ." (Citation omitted; internal quotation marks omitted.) *David* v. *New York*, 40 App. Div. 3d 572, 573, 835 N.Y.S.2d 377 (2007). The duty a school owes "to students and their parents is, on a general level, a duty to take whatever precautions are necessary reasonably to ensure the safety and welfare of the children entrusted to its custody and control against harm that the [school] anticipates, or reasonably should anticipate." *Doe Parents No. 1* v. *State Dept. of Education*, supra, 100 Haw. 80. What the duty quintessentially entails is "to exercise reasonable care in ensuring that students are educated in a safe environment free from any unreasonable risks of harm." Id., 81; see also *Henderson* v. *Simpson County Public School District*, supra, 847 So. 2d 857 ("schools have the responsibility to use ordinary care and to take reasonable steps to minimize foreseeable risks to students"). The degree of care required will vary depending on the particular risk at issue, the ages of the students in the school's custody and all of the attendant circumstances. *Dailey* v. *Los Angeles Unified School District*, supra, 2 Cal. 3d 748; *Doe* v. *DeSoto Parish School Board*, supra, 907 So. 2d 281; *Prier* v. *Horace Mann. Ins. Co.*,

supra, 351 So. 2d 268; see also *Haynes* v. *Middletown*, 314 Conn. 303, 314–15, 101 A.3d 249 (2014) (recognizing that school's duty to protect extends to high school students).[10]

In light of the foregoing authorities, it is beyond dispute that, as a general matter, a school having custody of minor children has an obligation to use reasonable care to protect those children from foreseeable harms during school sponsored activities, including educational trips abroad. The question we must consider, then, is whether there is something unique and/or compelling about foreseeable insect-borne diseases that should excuse schools that are organizing educational trips abroad from exercising reasonable care to minimize the possibility that the minors entrusted to their custody will contract such diseases. Stated otherwise, does Connecticut public policy mandate that, when it comes to foreseeable insect-borne diseases, there should be an exception to the general rule that schools must refrain from negligently exposing minor students, whom they have agreed to supervise in the absence of their parents, to foreseeable dangers? To answer that question, we begin by considering the first public policy factor, the normal expectations of the participants in an educational trip abroad.

As this case amply demonstrates, insect-borne diseases can pose significant threats to human health. When insect-borne diseases present serious risks, they become the subject of government warnings[11] and media attention.[12] The reason for the provision of such information is clear: people are interested in having it. When a particular disease is brought to an individual's attention, he or she can learn about the disease's prevalence, the areas in which the disease is endemic, whether there is a vaccine available and, if not, what other measures may be effective to prevent it. Furthermore, he or she can become aware of the symptoms of the disease, the damage to one's health that the disease might cause, and whether and how the disease, if contracted, may be treated. With all of this information in hand, the individual can make educated choices about whether to travel to an area where the disease is present and, if so, what protective measures should be taken, in light of the individual's particular tolerance to risk.

Many measures are available to protect against insect-borne diseases. They include staying away from areas where the insects at issue are known to proliferate, using an appropriate insect repellent, pretreating clothing or gear with the insecticide permethrin, covering exposed skin with clothing and/or hats, showering soon after coming indoors, sleeping in screened areas or with a bed net, and, in the case of ticks, checking one's body thoroughly to find them before they can attach. See Centers for Disease Control and Prevention,

"Avoid Bug Bites," available at https://wwwnc.cdc.gov/travel/page/avoid-bug-bites (last visited August 7, 2017), "Diseases Spread by Ticks," available at https://wwwnc.cdc.gov/travel/page/diseases-spread-by-ticks (last visited August 7, 2017). With some insect-borne diseases, preventive medicines or vaccinations are available. If an insect-borne disease is contracted, early recognition of symptoms can ensure that treatment is sought promptly, which, in some instances, could make a difference in the ultimate outcome.

Information directed at travelers about insect-borne diseases, and the measures to protect against them, is not hard to come by. It is freely available on the travel pages published by the CDC;[13] see footnote 11 of this opinion; and, further, on websites maintained by other foreign governments.[14] Additionally, as the evidence in this case demonstrated, there are many commercially produced publications that track and compile information for travelers about insect-borne diseases and the areas in which they are endemic.

In light of the foregoing, we believe that the normal expectations of participants in a school sponsored educational trip abroad, involving minor children, are that the organizer of the trip would take reasonable measures to warn the participants and their parents about the serious insect-borne diseases that are present in the areas to be visited and to protect the children from those diseases. School personnel who are organizing an educational trip abroad typically will have superior knowledge of travel planning in general, and the trip itinerary in particular, and, as explained previously, have a general responsibility to protect the minors in their charge while they are away from the custody of their parents. Given the potential dangers posed by serious insect-borne diseases, the existence of methods by which to avoid such diseases and the availability of useful information about them, trip participants naturally would expect the organizer of the trip to pass along appropriate warnings and to use ordinary care to minimize the disease risks posed by the insects in the particular areas to be visited. Trip organizers, for their part, likely would agree that reasonable protective measures, tailored to the risk, are doable and appropriate.[15] Accordingly, we conclude that the first factor of the public policy analysis supports the imposition of a duty on a school organizing a trip abroad to warn about, and to protect against, serious insect-borne diseases.

We turn next to the second and third factors of the analysis, namely, the public policy of encouraging participation in the activity at issue, while weighing the safety of the participants, and the avoidance of increased litigation. We recognize, as we must, that there are many benefits to international educational travel, and that it undeniably is the public policy of

Connecticut to promote such travel. See General Statutes § 10-27 (a) ("[i]t shall be the policy of the state to encourage its students, teachers, administrators and educational policy makers to participate in international studies, international exchange programs and other activities that advance cultural awareness and promote mutual understanding and respect for the citizens of other countries"). We disagree, however, that recognizing that a school's general duty to protect its students includes the responsibility to take reasonable measures to warn about, and to protect against, serious insect-borne disease risks will have a chilling effect on such travel.[16] Rather, it should have the salutary effect of promoting safety by ensuring that appropriate warnings are given and appropriate protective measures are taken. Compare *Ruiz* v. *Victory Properties, LLC*, supra, 315 Conn. 340–41 (recognizing duty of landlord to keep common area of property, where children are known to play, free of construction debris is likely to prompt responsible behavior because maintaining common areas is neither costly nor time-consuming; complete sanitization is not required, only "reasonable steps to protect against foreseeable injuries to children"), with *Lawrence* v. *O & G Industries, Inc.*, 319 Conn. 641, 659, 126 A.3d 569 (2015) (declining to recognize duty that "fail[ed] to provide a corresponding increase in safety"). Travel, of course, will always entail certain risks, some of which cannot be eliminated or reduced. The elimination of *unnecessary risks*, i.e., those that can be minimized with little effort, however, should encourage, rather than dampen, enthusiasm for traveling abroad. Cf. *Jagger* v. *Mohawk Mountain Ski Area, Inc.*, 269 Conn. 672, 703, 849 A.2d 813 (2004) (recognizing that skiers had duty of care to fellow skiers because "requiring skiers to participate in the reasonable manner prescribed by the rules of the sport actually will promote participation in the sport of skiing" by remedying harms and protecting safety). For risks that cannot be fully neutralized, appropriate warnings likely will suffice to satisfy the duty of care. See 1 Restatement (Third), supra, § 18, comment (h), p. 210. We emphasize that the duty to warn and protect does not amount to an absolute guaranty of safety, nor will it require, in every instance, that every possible precautionary measure be taken. Rather, the scope of the duty necessarily will vary, depending on the risk posed by the particular insect-borne illness at issue, the ages of the participants in the school sponsored trip, and all of the attendant circumstances.

In regard to the potential for increased litigation, we are skeptical that recognition of a school's duty to warn about, or protect against, a serious insect-borne illness when organizing an educational trip abroad will lead to a flood of similar actions. Our research has disclosed a dearth of claims with fact patterns similar to the present case, perhaps because the incidence of students

contracting serious insect-borne diseases while on educational trips abroad, when appropriate protective measures are taken, is relatively uncommon. Again, information about insect-borne diseases, and the methods to protect against them, is readily available to travel professionals in a number of resources. See footnotes 11 and 13 of this opinion.

Additionally, the mere recognition of a legal duty by no means creates an open and shut case for every potential plaintiff who may contract an insect-borne disease while on an educational trip abroad. "A cause of action in negligence is comprised of four elements: duty; breach of that duty; causation; and actual injury." (Internal quotation marks omitted.) *Lawrence* v. *O & G Industries, Inc.*, supra, 319 Conn. 649. Thus, recognition of a duty affords students who contract insect-borne diseases on educational trips abroad only an opportunity to prove that the disease at issue was foreseeable, that the school failed to appropriately warn of the danger of the disease and/or to take reasonable precautionary measures and that such failure was a substantial cause of the illness. As always, principles of comparative negligence will apply. *Vendrella* v. *Astriab Family Ltd. Partnership*, 311 Conn. 301, 325, 87 A.3d 546 (2014). In the case of public institutions, discretionary act immunity may be invoked. See General Statutes § 52-557n (a) (2) (B). It is pure speculation, therefore, that our holding today will open the floodgates to let loose a wave of future litigants who inevitably will prevail. Cf. *Ruiz* v. *Victory Properties, LLC*, supra, 315 Conn. 339–40 (imposing duty is not tantamount to imposing strict liability; it merely affords plaintiff "opportunity to prove to a jury that [her] injuries were foreseeable, that the defendant failed to take reasonable steps to avoid them, and that this failure was a substantial factor in bringing about those injuries"); see also *Doe* v. *DeSoto Parish School Board*, supra, 907 So. 2d 281 ("before a school board can be found to have breached the duty to adequately supervise the safety of students, the risk of unreasonable injury must be foreseeable, constructively or actually known, and preventable if a requisite degree of supervision had been exercised" [internal quotation marks omitted]); *Prier* v. *Horace Mann Ins. Co.*, supra, 351 So. 2d 268 ("[A] teacher is not liable in damages unless it is shown that he or she, by exercising the degree of supervision required by the circumstances, might have prevented the act which caused the damage, and did not do so. It also is essential to recovery that there be proof of negligence in failing to provide the required supervision and proof of a causal connection between that lack of supervision and the accident."); *Henderson* v. *Simpson County Public School District*, supra, 847 So. 2d 857 (although "[p]ublic schools have the responsibility to use ordinary care and to take reasonable steps to minimize foreseeable risks to students thereby providing

a safe school environment . . . [t]here is no liability predicated on lack or insufficiency of supervision where the event in connection with which the injury occurred is not reasonably foreseeable" [citation omitted; internal quotation marks omitted]); *Mirand* v. *New York*, supra, 84 N.Y.2d 50 ("[e]ven if a breach of the duty of supervision is established, the inquiry is not ended; the question arises whether such negligence was the proximate cause of the injuries sustained").[17]

Notably, in several of the cases that we have cited herein in support of the general principle that a school has a duty to protect the students in its custody, the plaintiffs ultimately did not prevail due to their inability to satisfy other elements of their negligence claims. See, e.g., *Prier* v. *Horace Mann Ins. Co.*, supra, 351 So. 2d 268–69 (although school had duty to protect child from foreseeable injuries, duty was not breached when trash burner that caused injury was not inherently dangerous and had been used without incident for forty years); *Graham* v. *Montana State University*, supra, 235 Mont. 289 (although defendant university had duty to supervise minor student attending summer program, it was not liable for her injuries sustained in motorcycle accident because proximate cause of injuries was negligence of another student who was operating motorcycle); *David* v. *New York*, supra, 40 App. Div. 3d 573–74 (although defendant school had duty to adequately supervise students on hayride, that duty was not breached because student-teacher ratio was adequate and there was no prior indication of hazard).

As we previously have explained, increased litigation may result in those cases in which, by holding that a duty exists, we effectively are "recognizing a new cause of action or otherwise breaking new ground . . . ." *Ruiz* v. *Victory Properties, LLC*, supra, 315 Conn. 340; see, e.g., *Lawrence* v. *O & G Industries, Inc.*, supra, 319 Conn. 659–60 (declining to hold that construction companies owe duty of care to workers on job site who lose work and thereby suffer purely economic harm due to accident caused by companies' negligence, because expanding companies' liability to encompass such claims likely would increase greatly pool of potential claimants); *Jarmie* v. *Troncale*, 306 Conn. 578, 614, 50 A.3d 802 (2012) (declining to extend doctor's duty to warn patient that medical condition could impair driving ability to third party injured in accident caused by patient "because it would open the door to an entirely new category of claims against health care providers . . . thereby greatly expanding [their] liability . . . and creating an additional burden on the courts," ultimately "driving up health care costs"). Such is not the case here. Rather, the duty to warn students about, and to protect them against, foreseeable insect-borne diseases is but one specific aspect of the already well established general duty of schools to take reasonable measures to ensure the safety of the minors over whom

they have assumed custody. We conclude that the second and third public policy factors support the imposition of a duty on a school to warn about, and protect against, the risk of serious insect-borne diseases when organizing a trip abroad.

We turn to the final public policy factor, the decisions of other jurisdictions. Our research has not disclosed any decision that truly is analogous to the present one. We have reviewed the cases cited by the parties and the amici in addressing this factor and find them to be largely unhelpful. The cases on which the plaintiff relies involve very different types of injuries and therefore provide support only for the general proposition that schools taking custody of minor children are responsible for their protection and care. See, e.g., *Shin* v. *Sunriver Preparatory School, Inc.*, 199 Or. App. 352, 359, 111 P.3d 762 (sexual assault by parent and resultant emotional harm), rev. denied, 339 Or. 406, 122 P.3d 64 (2005); see also *Bellman* v. *Cedar Falls*, supra, 617 N.W.2d 15 (child killed when struck by golf cart commandeered by kindergarteners). Cases seemingly favoring the defense, because they absolve defendants of liability for injuries caused to others by insects, concern claims brought by adult plaintiffs under theories of premises liability, a substantially different context. See, e.g., *Riley* v. *Champion International Corp.*, 973 F. Supp. 634, 642–43 (E.D. Tex. 1997); *Belhumeur* v. *Zilm*, 157 N.H. 233, 236–38, 949 A.2d 162 (2008). In addition, many of the cited cases turn on the issue of foreseeability, a question which, as we have explained, is not before us.[18] See, e.g., *Rodgers* v. *La Quinta Motor Inn*, 316 Ark. 644, 647, 873 S.W.2d 551 (1994); *Butcher* v. *Gay*, 29 Cal. App. 4th 388, 400–401, 404, 34 Cal. Rptr. 2d 771 (1994); *Rhodes* v. *B. C. Moore & Sons, Inc.*, 153 Ga. App. 106, 107, 264 S.E.2d 500 (1980); *David* v. *New York*, supra, 40 App. Div. 3d 574. For these reasons, we conclude that the fourth public policy factor in the present case is essentially neutral.

The defendant insists that there should be no duty to warn or to protect in the circumstances of this case because the chances of the plaintiff contracting tick-borne encephalitis were remote. Although, in a given case, the rarity of a particular illness should be weighed by the jury when determining whether its contraction was foreseeable, or whether the warnings given and protective measures taken by a school satisfied the duty of care, it is not relevant to a public policy analysis, which should be undertaken by a court without reference to the facts of a particular case.[19]

Although the question of whether the defendant properly was proven to be negligent is not before us, we close with the following observation. Although we agree that tick-borne encephalitis is not a widespread illness, when it strikes, the results can be devastating. At the same time, some of the measures one might take to

protect against it are simple and straightforward—covering exposed skin, applying insect repellent containing DEET,[20] closely checking one's body for ticks and/or avoiding the woods in areas where the disease is known to be endemic. The case thus brings to mind the risk-benefit calculus articulated long ago by Judge Learned Hand to determine whether, in given circumstances, reasonable care has been exercised. Pursuant to that formulation, both the likelihood *and* the gravity of potential harm should be taken into consideration, as well as the burden of taking adequate precautions to prevent that harm from occurring. See *United States* v. *Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir. 1947). In short, "[g]iven a balancing approach to negligence, even if the likelihood of harm stemming from the actor's conduct is small, the actor can be negligent if the severity of the possible harm is great and the burden of precautions is limited." 1 Restatement (Third), supra, § 3, comment (f), p. 31; see also 3 F. Harper et al., Harper, James & Grey on Torts (3d Ed. 2007) § 16.9 (2), p. 523 ("[i]f the harm that may be foreseen is great, conduct that threatens it may be negligent even though the statistical probability of its happening is very slight indeed"); 3 F. Harper et al., supra, § 16.9 (3), p. 528 ("the law imposes liability for failure to take precautions, even against remote risks, if the cost of the precautions would be relatively low"). When schools are fulfilling their duty to supervise students in their custody, these admonitions should be taken into account.

In sum, we conclude that the public policy of Connecticut does not preclude imposing a duty on a school to warn about or to protect against the risk of a serious insect-borne disease when organizing a trip abroad. For that reason, we answer the first certified question in the affirmative.

II

We turn to the second certified question, whether the damages award of approximately $41.5 million, which included noneconomic damages of $31.5 million, warranted a remittitur. We conclude that the award, although sizeable, fell within the necessarily uncertain limits of just damages. Accordingly, we answer the second certified question in the negative.

The following procedural history is relevant. After the jury returned a verdict in the plaintiff's favor and awarded damages of approximately $41.5 million, $31.5 million of which were awarded for pain and suffering, the defendant challenged the award, seeking a remittitur of the noneconomic portion. The defendant did not claim that there was any jury impropriety but, rather, contended that the award was excessive as a matter of law. The District Court, in a comprehensive memorandum of decision, rejected this claim and declined to order a remittitur. The following additional facts are recounted in that court's decision.

Ten days after visiting Mount Panshan, while still in China, the plaintiff began to suffer from a headache, a fever and wooziness. She grew disoriented and was taken to a local hospital. When her condition rapidly deteriorated, the local hospital transferred her to a Beijing hospital. After the plaintiff's parents were contacted, they flew from New York, where the family resides, to Beijing. When they arrived, the plaintiff was partially paralyzed and could not speak; thereafter, she became semicomatose.[21] The plaintiff's parents then had her airlifted to New York, where she was admitted to New York-Presbyterian Hospital.

After a week in the hospital and a month at a rehabilitation facility, the plaintiff's condition stabilized and improved, but she remains permanently disabled. Most markedly, she cannot speak, but can only utter soft, monosyllabic, childlike sounds. The plaintiff has limited dexterity in her hands, particularly in her fingers, which are too stiff to bend easily. This inhibits the fine motor skills necessary to facilitate typing. The plaintiff also has limited control over her facial muscles, causing her to drool, to have difficulty eating and swallowing, and to exhibit socially inappropriate facial expressions.

The plaintiff has compromised brain functioning, particularly in the area of executive function, which makes it difficult for her to construct multistep solutions to everyday problems. As a consequence, she scores low on tests that gauge problem solving ability. Although her verbal comprehension scores remain at preinjury levels—in the ninety-sixth percentile—her reading comprehension and math comprehension scores have fallen to the third and first percentiles, respectively. Her scores on perceptual reasoning also are low, in the twelfth percentile. In short, although she remains an intelligent person, she has difficulty using her intelligence.

As the District Court explained, however, the plaintiff "is in other ways normal. She still experiences the world much the same way as a person without a brain injury might—she understands what happens around her, she reads, she writes, she feels, she has opinions, and she dreams about her future." With assistance and accommodations, the plaintiff was able to finish high school and, at the time of trial, was enrolled in college.

The District Court commented extensively on the evidence of the plaintiff's suffering, characterizing her condition as "a perfect storm of symptoms that, taken together, magnify individual deficits into a debilitating and humiliating disability." It explained: "[The plaintiff] cannot talk. . . . She cannot communicate through sign . . . nor can she type quickly enough to allow a computer to generate audible words at a natural speed—it takes her a long time to produce a short phrase.[22] . . . [The plaintiff] is not only mute; she can-

not have a sustained or rewarding social exchange with another person. [The plaintiff] cannot loosen her facial muscles enough to register her emotions accurately. . . . She cannot tighten her muscles when they slacken, which means she often drools so profusely that strangers stare at her in public places. . . . [The plaintiff] always looks like she is flashing a wide-eyed smile, and she sometimes wears wrist bands to mop her saliva. Her facial expressions alternately alienate or disgust the people she attempts to befriend. [The plaintiff] lacks cognitive skills; in particular, she has limited executive function . . . [b]ut she also has retained much of her raw, preinjury intelligence. . . . [The plaintiff's] cognitive injuries are greater than simply being unable to work through complex problems—she perceives the right solution but cannot implement it. As the [plaintiff's] counsel described, [the plaintiff] 'is like a world-class sprinter forced to live in a box for the next 66 years,' " i.e., the plaintiff's life expectancy at the time of her injury. (Citations omitted; footnote added.)

In the District Court's view, the "evidence supported the theory that [the plaintiff's] injuries are uniquely cruel." The court recounted testimony from both of the plaintiff's parents, and from other witnesses, that she had no friends or social life and lived an isolated existence, with her only social contact being online. It noted the plaintiff's belief, to which she had testified, that she will never date or have a family, but, rather, will become an "old spinster." The court further summarized the expert testimony, stating "that it would be difficult for [the plaintiff] to perform the basic tasks necessary to manage her own life, let alone ensure the growth, health and safety of a child."

Describing the emotional effect of her circumstances, the District Court explained that her "solitude stings her acutely," that she had contemplated suicide and that she feels shame when strangers gawk at her in restaurants as she struggles to eat, in a manner described by her father as childlike. It noted expert testimony that the plaintiff was at future risk for depression as her life became less structured. The court continued: "[The plaintiff's] heart broke when a boy that she dated prior to her trip to China dumped her and posted cutting remarks about her on Facebook. . . . She rages when people assume that she suffers from severe mental retardation, and she cannot correct that impression. . . . *Perversely, [the plaintiff] is arguably in a more emotionally compromised position than some people with more profound cognitive impairments because they may have the odd blessing of not understanding the depth of others' rejection of them. Thus, according to witnesses, [the plaintiff] lives in a peculiar hell: she knows what she has lost, cannot find cathartic expression for that loss and is treated as if she has lost far more. Because she has a normal life expectancy, she may suffer alone in this state for the*

*next sixty-plus years.*" (Citations omitted; emphasis added.)

The District Court also addressed the plaintiff's physical pain and suffering, namely, her endurance of "a grueling illness and recovery," which at its worst had her paralyzed and semicomatose. For a period of time, the plaintiff had to be fed through a feeding tube that she described as "so painful . . . like swallowing pool water three times a day." The plaintiff spent weeks in rehabilitation relearning basic tasks. She remains physically limited in many ways, including an impeded ability to use her arms, hands and legs due to extreme muscle tightness and stiffness. Moreover, the evidence at trial was that, given the nature of her brain injury, she would not be making any further meaningful improvement.

In sum, the District Court stated, "[w]itnesses' accounts and [the court's] own courtroom observations of [the plaintiff's] emotional and physical suffering depict a miserable life." Although the court allowed that the plaintiff had retained some abilities and had partaken in some positive experiences since her illness, "the issue here is not whether [the plaintiff] might cobble together fulfilling moments during her life, [but] whether the jury reasonably could have found that she rarely will be able to do so, and, thus, fairly awarded [the plaintiff] a large amount of money to compensate her for that loss." In the court's view, the plaintiff had "provided the jury with more than enough evidence to reach that pessimistic conclusion."

The District Court rejected the defendant's claim that the jury's award was simply excessive as a matter of law, noting the defendant's concession that there was no evidence "that the [jurors had] ignored the law, acted out of punitive animus toward the defendant or otherwise failed to fulfill their duties responsibly." Rather, the jury "struck [the court] as [diligent] attentive, serious, and dedicated." The court surveyed some cases in which large damages awards had been rendered, concluding that the injuries at issue in those cases, when considered together, provided a fair benchmark and an assurance that the award in this case was not excessive. Specifically, when the plaintiff's award and those from the case law were broken down into annual rates of compensation, on the basis of each injured party's remaining life expectancy, the plaintiff's award actually fell on the lower end of the resulting range of values.

The District Court concluded by propounding unanswerable questions: "What is the price of relying on your parents to find you a prom date? . . . How much money replaces the loss of the joy you felt when playing the piano? . . . Can you calculate the cost of missing your teenage years, of never maturing socially and emotionally beyond the age of fifteen?" (Citations omitted.)

It thereafter upheld the award as falling within the range of reasonable verdicts.

We turn to the applicable law. In Connecticut, "the proper standard of review of a trial court's decision to grant or deny a motion to set aside a verdict as excessive as a matter of law is that of an abuse of discretion. . . . Accordingly, the ruling of the [District] [C]ourt on the motion to set aside the verdict as excessive is entitled to great weight and every reasonable presumption should be given in favor of its correctness." (Citation omitted; internal quotation marks omitted.) *Saleh* v. *Ribeiro Trucking, LLC*, 303 Conn. 276, 282, 32 A.3d 318 (2011). Additionally, where, as here, a trial court and a jury have concurred in their determination that a particular damages award is appropriate, that circumstance provides "a persuasive argument for sustaining the action of the court on the motion." (Internal quotation marks omitted.) *Birgel* v. *Heintz*, 163 Conn. 23, 30, 301 A.2d 249 (1972); see also *Camp* v. *Booth*, 160 Conn. 10, 12, 273 A.2d 714 (1970) ("[t]he refusal of the trial court to disturb the jury's determination adds support to the propriety of the verdict").

The reason for such a deferential standard is clear. "Litigants have a constitutional right to have factual issues resolved by the jury. . . . This right embraces the determination of damages when there is room for a reasonable difference of opinion among fair-minded persons as to the amount that should be awarded. . . . This right is one obviously immovable limitation on the legal discretion of the court to set aside a verdict, since the constitutional right of trial by jury includes the right to have issues of fact as to which there is room for a reasonable difference of opinion among fairminded men passed upon by the jury and not by the court." (Citations omitted; internal quotation marks omitted.) *Mather* v. *Griffin Hospital*, 207 Conn. 125, 138, 540 A.2d 666 (1988). Accordingly, "we consistently have held that a court should exercise its authority to order a remittitur rarely—only in the most exceptional of circumstances"; *Saleh* v. *Ribeiro Trucking, LLC*, supra, 303 Conn. 280; and where the court can articulate "very clear, definite and satisfactory reasons . . . for such interference." (Internal quotation marks omitted.) Id., 283.

"Proper compensation cannot be computed by a mathematical formula, and there is no iron-clad rule for the assessment of damages." *Campbell* v. *Gould*, 194 Conn. 35, 40, 478 A.2d 596 (1984). "In determining whether to order remittitur, the trial court is required to review the evidence in the light most favorable to sustaining the verdict. . . . Upon completing that review, the court should not interfere with the jury's determination except when the verdict is plainly excessive or exorbitant. . . . The ultimate test which must be applied to the verdict by the trial court is whether

the jury's award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury [was] influenced by partiality, prejudice, mistake or corruption. . . . The court's broad power to order a remittitur should be exercised only when it is manifest that the jury [has] included items of damage which are contrary to law, not supported by proof, or contrary to the court's explicit and unchallenged instructions." (Citation omitted; internal quotation marks omitted.) *Saleh* v. *Ribeiro Trucking, LLC*, supra, 303 Conn. 281. This court has upheld a remittitur order only when we "have laid before us a very clear and striking case of indubitable wrong, so clear and striking as to indicate the influence of undue sympathy, prejudice or corruption on the verdict." (Internal quotation marks omitted.) Id., 283.

In regard to the type of damages at issue, this court has "long held that the loss of life's enjoyments is compensable in personal injury and wrongful death cases." *Mather* v. *Griffin Hospital*, supra, 207 Conn. 150. "Damages may be awarded for pain and suffering, past, present and future, resulting from the injuries so long as the evidence affords a basis for a reasonable estimate by the trier of fact of the amount." *Vajda* v. *Tusla*, 214 Conn. 523, 532, 572 A.2d 998 (1990). "[A]lthough it is difficult to measure emotional distress in terms of money, [a]n award of damages for pain and suffering is peculiarly within the province of the trier of fact . . . ." (Internal quotation marks omitted.) *Bhatia* v. *Debek*, 287 Conn. 397, 420, 948 A.2d 1009 (2008). Such is also the case with "compensation for activities in which the plaintiff engaged, prior to [her] injury, which, as a result of that injury, are now foreclosed to [her]." *Jerz* v. *Humphrey*, 160 Conn. 219, 223, 276 A.2d 884 (1971). Those damages lie in an "extremely uncertain area . . . one in which it is quite impossible to assign values with any precision," and, therefore, are best left to a jury. Id.

Giving due consideration to the foregoing principles and the District Court's view of the evidence, we conclude that the noneconomic damages awarded in this tragic case, although clearly generous, fall within the acceptable range of just compensation. Although no formulaic process of review applies, we will make a few observations. First, there is no allegation that the jury in this case was prejudiced, incompetent or otherwise compromised, but only that its verdict was improperly large. In only the rarest of circumstances should the size of a verdict, standing alone, warrant setting aside that verdict. We do not believe such circumstances are present here. Importantly, the District Court's careful and thorough review of the verdict, and its ultimate decision to let it stand, provided an important check against any claim of undue sympathy. In upholding the verdict, the judge, who was in a posi-

tion to evaluate the testimony firsthand and is guided by his oath, training and role as an impartial arbiter, concluded that such sympathy was not present. Second, the plaintiff in this case was very young and, despite her injuries, retained a long life expectancy. Accordingly, the period of time over which she is expected to suffer—sixty-six years—is an extensive one. Further, the evidence at trial suggested that the physical effects of her injuries will worsen as she ages and that her psychological condition will deteriorate as the structure characteristic to a young life abates. Additionally, the plaintiff eventually will lose the support of her parents which, by all accounts, was crucial to her recovery and relatively high functioning. Third, we see no fault in the District Court's assessment of the plaintiff's particular set of injuries as uniquely cruel. Through the combination of an inability to speak, control her facial expressions and move her fingers effectively, she has completely lost the ability to have meaningful communication and interaction with other people. Although one can certainly conceive of physical injuries more extreme than those suffered by the plaintiff, it is the destruction of the plaintiff's ability to connect with other people, along with her full awareness of the situation, that makes her suffering stand out. Similarly, a loss of the executive brain function that allows one to access and use intelligence, while at the same time retaining such intelligence, is particularly frustrating. Finally, the plaintiff's mother testified about her passions in life and her dreams, prior to her injury, which included sports, playing the piano and learning to speak foreign languages. The destructive effect of her injuries on these enjoyments and aspirations is painfully apparent.

The defendant invites us to examine the verdicts returned by other juries in other cases and to engage in an exercise of comparing which plaintiff's injuries are worse. We decline this invitation.[23] As we previously have explained, "[n]o one life is like any other, and the damages for the destruction of one furnish no fixed standard for others." (Internal quotation marks omitted.) *Katsetos* v. *Nolan*, 170 Conn. 637, 658, 368 A.2d 172 (1976); see also *Waldron* v. *Raccio*, 166 Conn. 608, 618, 353 A.2d 770 (1974). Consequently, "[i]t serves no useful purpose to compare a verdict in one personal injury case with the verdicts in other personal injury cases. . . . The question is one peculiarly within the province of the jury. Juries may differ widely in the conclusions which they reach in what may be apparently similar cases, and, in fact, in any given case one jury may arrive at a result substantially different from that of another jury." (Citations omitted.) *Birgel* v. *Heintz*, supra, 163 Conn. 34. In the absence of evident mistakes or partiality, however, we defer to the jury's judgment, as the District Court did here. For the foregoing reasons, we answer the second certified question

in the negative.

We answer the first certified question, "Yes."

We answer the second certified question, "No."

No costs shall be taxed in this court to either the plaintiffs or the defendant.

In this opinion the other justices concurred.

* August 11, 2017, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] General Statutes § 51-199b (d) provides: "The Supreme Court may answer a question of law certified to it by a court of the United States or by the highest court of another state or of a tribe, if the answer may be determinative of an issue in pending litigation in the certifying court and if there is no controlling appellate decision, constitutional provision or statute of this state."

[2] For a more complete discussion of the underlying facts, see *Munn* v. *Hotchkiss School*, 24 F. Supp. 3d 155 (D. Conn. 2014).

[3] Cara L. Munn's parents, Orson D. Munn III and Christine Munn, also were named as plaintiffs in this matter due to their incurrence of substantial expenses, on her behalf, which they sought to recoup. For simplicity, we refer hereinafter to Cara L. Munn alone as the plaintiff.

[4] Throughout the record, Mount Panshan is referred to variously as "Mount Pan," "Mt. Pan" and "Panshan mountain."

[5] A printout of the page addressing China on the CDC website, quoted previously, was introduced as a defense exhibit at trial. On appeal to the Second Circuit, the defendant argued that the jury could not rely on it as evidence of foreseeability because it is dated August 1, 2007, i.e., just after the school trip. That court rejected the defendant's attempt to discredit its own exhibit in favor of another CDC advisory dated May 23, 2007, which did not mention tick-borne encephalitis, because the May advisory was not part of the trial record. Additionally, the court reasoned that, "while the August 1, 2007 advisory postdates the trip, it is possible that a similar advisory was on the website before, which would explain Thompson's testimony about seeing the advisory. Neither party presented evidence about what was posted on the CDC website when the trip actually occurred, and we will not disturb the jury's assessment of the evidence and its finding of reasonable foreseeability."

Before this court, the defendant again suggests that its own trial exhibit, as well as Thompson's testimony that he had seen the contents of that exhibit prior to the trip, is not reliable evidence. Because a determination of the competence of the evidence in this case is well beyond the scope of the certified questions, we must accept the conclusion of the Second Circuit that the jury properly relied upon that evidence.

[6] As the District Court explained, an exurban landscape is "a traditionally rural community with growing housing density created by commuters to the cities."

[7] We pause to emphasize that we are called upon to undertake the second determination only. The jury in this case determined, on the evidence presented at trial, that the plaintiff's infection with tick-borne encephalitis, or harm of that general nature, was foreseeable, and both the District Court and the Second Circuit have upheld that finding. See *Vendrella* v. *Astriab Family Ltd. Partnership*, 311 Conn. 301, 331–32, 87 A.3d 546 (2014) (unless fair and reasonable minds could reach only one conclusion, foreseeability is question of fact for jury). Specifically, in addition to the page addressing China on the CDC website that discussed tick-borne encephalitis in forested areas in northeastern China, which Thompson acknowledged seeing in advance of the trip, there also were in evidence: a CDC page directed at east Asia generally, dated April 23, 2007, which warned of the risk of several other insect-borne diseases; a British health advisory that warned of tick-borne encephalitis "in forested regions of China and Japan"; and expert testimony, as summarized by the District Court, that, "according to travel medicine reports routinely consulted by doctors and commercial trip planners in 2007, rural China was an endemic region for [tick-borne encephalitis], Japanese encephalitis, and Lyme disease."

Throughout its brief, the defendant emphasizes the remoteness of the risk of contracting tick-borne encephalitis. Although that factor is relevant to the duty analysis, it mainly informs the issue of foreseeability. We agree with the District Court that the public policy aspect of the duty analysis

does not afford the defendant a new opportunity to relitigate the issue of foreseeability. See 1 Restatement (Third), Torts, Liability for Physical and Emotional Harm § 7, comment (j), pp. 82–83 (2010) (disapproving of use of foreseeability in judicial determinations of whether, for policy reasons, no duty should exist); see also *A.W.* v. *Lancaster County School District 0001*, 280 Neb. 205, 212–16, 784 N.W.2d 907 (2010) (explaining why courts should not consider factual issue of foreseeability when making determinations of legal duty).

[8] This court has recognized that children outside of their parents' supervision require special protection. See, e.g., *Purzycki* v. *Fairfield*, 244 Conn. 101, 106, 708 A.2d 937 (1998) (school officials are not immune from liability to child injured in unsupervised hallway), overruled in part by *Haynes* v. *Middletown*, 314 Conn. 303, 316, 101 A.3d 249 (2014). In determining duty, we also have recognized the limited capacity of children to fully appreciate risks. See *Ruiz* v. *Victory Properties*, *LLC*, supra, 315 Conn. 333 ("[a]s to the care required of others in relation to children, the . . . propensity of children [to disregard dangerous conditions] has been taken into consideration in evaluating the negligence of these others" [internal quotation marks omitted]).

[9] We cite these examples merely to demonstrate the range of circumstances in which the duty may apply, and not to suggest that we necessarily would extend the duty to all of the circumstances enumerated.

[10] One court has observed that, although high school students may require less rigorous and intrusive methods of supervision than younger children, "adolescent high school students are not adults and should not be expected to exhibit that degree of discretion, judgment, and concern for the safety of themselves and others which we associate with full maturity." *Dailey* v. *Los Angeles Unified School District*, supra, 2 Cal. 3d 748.

[11] See, e.g., Centers for Disease Control and Prevention, "African Tick-Bite Fever," available at https://wwwnc.cdc.gov/travel/diseases/african-tick-bite-fever (last visited August 7, 2017) (warning travelers to sub-Saharan Africa and West Indies of African tick-bite fever), "African Trypanosomiasis (African Sleeping Sickness)," available at https://wwwnc.cdc.gov/travel/diseases/african-sleeping-sickness-african-trypansosomiasis (last visited August 7, 2017) (warning travelers to sub-Saharan Africa of African trypanosomiasis spread by tsetse flies), "Chagas Disease (American Trypanosomiasis)," available at https://wwwnc.cdc.gov/travel/diseases/chagas-disease-american-trypanosomiasis (last visited August 7, 2017) (warning travelers to Mexico, Central America and South America of Chagas disease spread by triatomine bugs), "Chikungunya," available at https://wwwnc.cdc.gov/travel/diseases/chikungunya (last visited August 7, 2017) (warning travelers to Africa, Asia, parts of Central and South America, and islands in Indian Ocean, western and South Pacific, and Caribbean of chikungunya spread by mosquitoes), "Dengue," available at https://wwwnc.cdc.gov/travel/diseases/dengue (last visited August 7, 2017) (warning travelers to tropical and subtropical regions of dengue spread by mosquitoes); "Japanese Encephalitis," available at https://wwwnc.cdc.gov/travel/diseases/japanese-encephalitis (last visited August 7, 2017) (warning travelers to certain areas of Asia of Japanese encephalitis spread by mosquitoes), "Malaria," available at https://wwwnc.cdc.gov/travel/diseases/malaria (last visited August 7, 2017) (warning travelers to Africa, Central and South America, parts of Caribbean, Asia, eastern Europe and south Pacific of malaria spread by mosquitoes), "Murray Valley Encephalitis Virus," available at https://wwwnc.cdc.gov/travel/diseases/murray-valley-encephalitis-virus (last visited August 7, 2017) (warning travelers to New Guinea and certain areas of Australia of Murray Valley encephalitis spread by mosquitoes), "Plague," available at https://wwwnc.cdc.gov/travel/diseases/plague-bubonic-pneumonic-septicemic (last visited August 7, 2017) (warning travelers to Africa, central Asia, Indian subcontinent, northern South America and parts of southwestern United States of three types plague spread by fleas), "Rift Valley Fever," available at https://wwwnc.cdc.gov/travel/diseases/rift-river-valley (last visited August 7, 2017) (warning travelers to Africa of Rift Valley fever spread by mosquitoes), "Ross River Virus Disease," available at https://wwwnc.cdc.gov/travel/diseases/ross-river-virus-disease (last visited August 7, 2017) (warning travelers to Australia and Papua New Guinea of Ross River virus disease spread by mosquitoes), "Tick-borne Encephalitis," available at https://wwwnc.cdc.gov/travel/diseases/tickborne-encephalitis (last visited August 7, 2017) (warning travelers to Europe and Asia of tick-borne encephalitis), "West Nile Virus," available at https://wwwnc.cdc.gov/travel/diseases/west-nile-virus (last visited August 7, 2017) (warning travelers to Africa, Europe, Middle East,

portions of Asia, and North America of West Nile virus spread by mosquitoes), "Yellow Fever," available at https://wwwnc.cdc.gov/travel/diseases/yellow-fever (last visited August 7, 2017) (warning travelers to certain parts of South America and Africa of yellow fever spread by mosquitoes), and "Zika," available at https://wwwnc.cdc.gov/travel/diseases/zika (last visited August 7, 2017) (generally warning of Zika spread by mosquitoes). In addition to providing a warning, all of the CDC notices contain a section detailing what travelers can do to prevent each disease.

[12] See, e.g., L. Alvarez & P. Belluck, "Pregnant Women Advised to Avoid Travel to Active Zika Zone in Miami Beach," The New York Times, August 19, 2016, available at https://www.nytimes.com/2016/08/20/science/5-zika-cases-were-transmitted-in-miami-beach-florida-governor-says.html?_r=0 (last visited August 7, 2017); S. Scutti, "Experts warn of increases in tick-borne Powassan virus," CNN, May 3, 2017, available at http://www.cnn.com/2017/05/03/health/powassan-tick-virus/ (last visited August 7, 2017); R. Ferris, "One sign that 2017 will be a bad year for Lyme disease," CNBC, March 6, 2017, available at www.cnbc.com/2017/03/06/one-sign-that-2017-will-be-a-bad-year-for-lyme-disease.html (last visited August 7, 2017); R. Dawood, "Tick-borne encephalitis threat in central Europe," The Telegraph, June 27, 2008, available at http://www.telegraph.co.uk/travel/travelnews/2202634/Tick-borne-encephalitis-threat-in-central-Europe.html (last visited August 7, 2017).

[13] There was a consensus among the witnesses at trial that the CDC is a standard and primary source used by travel professionals to determine the risks present in a particular area when planning a trip to that area. The defendant's expert David Freedman, a physician who is certified in infectious diseases, tropical and travel medicine, and epidemiology, testified that "the CDC is the [source] that would be regarded as the standard for [travel medicine advice] . . . . The CDC are our national guidelines for travel medicine." Thompson agreed: "The standard [sources] that we reference are the CDC, that's the first and foremost . . . ." McKenzie, too, stated that in evaluating travel related health risks "the obvious and primary [sources] in the [United States] would be the CDC and the State Department."

[14] See, e.g., Travel Health Pro, "Diseases in Brief," available at https://travelhealthpro.org.uk/diseases (last visited August 7, 2017) (travel health website established under United Kingdom Department of Health).

[15] In the present case, the defendant essentially has admitted as much. As the District Court recounted, "[a]t trial, Head of School Malcolm McKenzie testified that the school has an unquestionable duty to protect the kids from dangerous conditions and injuries wherever it can. . . . McKenzie further testified that the school warns students of the risk of malaria [when organizing trips] in tropical regions . . . and it requires students to take steps to prevent infection. . . . Thompson also affirmed that the school had a duty to determine if there were disease risks on the [China] trip and, specifically, to protect [the plaintiff] against [insect-borne] disease." (Citations omitted; internal quotation marks omitted.) Relatedly, the defendant's travel materials addressed the need for immunizations and other medical issues. There was also ample evidence at trial that the defendant took measures to warn students against the risk of Lyme disease, another tick-borne illness, at its Lakeville campus, and to protect them against that risk. The school's approach is undoubtedly correct. See 2 Restatement (Second), supra, § 314A, comment (d), p. 119 ("[t]he duty to protect the other [in custody] against unreasonable risk of harm extends to risks . . . arising from forces of nature or animals").

[16] In fact, the sizeable verdict in this case, and the District Court's refusal to set it aside on the basis that no such duty existed, has not caused the defendant to cease offering its international travel programs. Rather, according to the defendant's website, nearly one quarter of its students still participate in these programs annually. See The Hotchkiss School, "Travel Programs," available at https://www.hotchkiss.org/academics/travel-programs (last visited August 7, 2017).

The defendant contends that this case already has spurred additional, unwarranted litigation, drawing our attention to an action that was filed by the plaintiff's attorney on behalf of another minor who contracted Lyme disease while at camp. See *Horowitz* v. *YMCA Camp Mohawk, Inc.*, United States District Court, Docket No. 3:13-CV-01458 (SRU) (D. Conn. 2013). That case apparently has been terminated with a confidential settlement. In the absence of any information as to the facts of the matter or the terms of its settlement, we decline to speculate as to its import, if indeed there is any.

[17] The facts of this case are illustrative. The plaintiff did not prevail simply

because of the existence of a legal duty; rather, she produced compelling evidence that the contraction of tick-borne encephalitis on Mount Panshan was foreseeable; see footnote 7 of this opinion; and that the defendant's various failures to exercise reasonable care caused her to contract that illness. In regard to those failures, we find the District Court's observations to be apt: "The school assumes that if public policy allows the [plaintiff] to bring these claims, it could only avoid liability if it chose the most extreme prophylaxis, [b]ut that is not necessarily the case. Here, [the defendant] made no attempt to warn students about insects or to protect students against insect-borne disease. This is not a case where the school provided students with simple, accurate advice about the risk of insect-borne disease and then a quick, gentle reminder to apply bug spray before hiking. The jury may well have found for the defendant had [it] taken those two precautions but not instructed its teachers to apply the [bug] spray onto students' skin or failed to insist that students wear long sleeves and long pants. *Too much went wrong* in the spring and summer of 2007 for this case to resolve the question of the minimum amount of care required for a school to discharge its duty to protect students from insect-borne disease on school trips abroad." (Emphasis added.) We note in this regard that the third public policy factor does not require the minimization of litigation at all costs, but rather, "focuses upon the diminishment of an *inappropriate* flood of litigation." (Emphasis in original.) *Jagger* v. *Mohawk Mountain Ski Area, Inc.*, supra, 269 Conn. 703. Nevertheless, if the recognition of a duty of care encourages potential defendants to exercise reasonable care and take protective measures, "litigation is unlikely to increase; it may even decrease." *Monk* v. *Temple George Associates, LLC*, 273 Conn. 108, 120, 869 A.2d 179 (2005).

[18] See footnote 7 of this opinion.

[19] "[T]he Restatement (Third) [supra] explains that because the extent of foreseeable risk depends on the specific facts of the case, courts should leave such determinations to the trier of fact unless no reasonable person could differ on the matter. Indeed, foreseeability determinations are particularly fact dependent and case specific, representing a [factual] judgment about a course of events . . . that one often makes outside any legal context. So, by incorporating foreseeability into the analysis of [public policy], a court transforms a factual question into a legal issue and expands the authority of judges at the expense of juries or triers of fact.

"That is especially peculiar because decisions of foreseeability are not particularly legal, in the sense that they do not require special training, expertise, or instruction, nor do they require considering far-reaching policy concerns. Rather, deciding what is reasonably foreseeable involves common sense, common experience, and application of the standards and behavioral norms of the community—matters that have long been understood to be uniquely the province of the finder of fact." (Footnotes omitted; internal quotation marks omitted.) *A.W.* v. *Lancaster County School District 0001*, supra, 280 Neb. 212.

[20] Stuart Rose, a physician with expertise in travel medicine who provided expert testimony for the plaintiff, testified that he, like any competent travel medicine practitioner, would give the same advice as that published on the CDC website to protect against tick bites and that DEET based insect repellents, when properly applied, are 80 to 100 percent effective against ticks. In Rose's opinion, if the plaintiff had employed tick protection measures, she would not have contracted tick-borne encephalitis. The jury apparently credited this testimony.

[21] At trial, the plaintiff's mother described her condition in the Beijing hospital: "[S]he was curled up and had her arms like this . . . looking up to the ceiling and totally like she was retarded and in shock and couldn't move and [was] frozen. . . . She couldn't speak. She couldn't move. Her eyes were rolled up, almost behind her head. It was just the [most] horrific picture a mother could ever, ever imagine seeing." Because the plaintiff's condition was yet to be diagnosed, and her doctors feared that it was contagious, her parents were not allowed to touch her.

[22] At trial, the plaintiff testified by typing answers to questions into a machine, which would convert the written answers into a computer generated voice.

[23] Notably, however, the noneconomic damages award in this case is not the largest verdict of its kind in Connecticut. See *D'Attilo* v. *Viscarello*, Docket No. UWY-CV-05-4010135-S, Superior Court, judicial district of Waterbury (May 25, 2011) (awarding $50 million in noneconomic damages for forty-three years of expected pain and suffering), available at 2011 WL

2489003 (West's Jury Verdict and Settlement Summary 2015).

---